## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

UNITED STATES OF AMERICA

     Plaintiff,

                                  Case No. 98-cv-73252

v.                                 Hon. Paul D. Borman

BAY-HOUSTON TOWING CO.,

     Defendant.

_____/

## ORDER REGARDING MODIFICATION OF CONSENT DECREE

Whereas, on August 11, 2006, a certain Consent Decree ("Consent Decree") was issued as an order of the U.S. District Court for the Eastern District of Michigan in Case No. 98-CV-73252, "United States of America v. Bay-Houston Towing Co.", by Judge Avern Cohn (the "Litigation"). A copy of the Consent Decree is attached hereto as Exhibit A and incorporated herein by reference.

Whereas, Defendant Bay-Houston Towing Co., a Texas corporation, ("Bay-Houston") is the sole owner of all assets of its division known as the Michigan Peat division, which division and assets are subject to the Consent Decree.

Whereas, Bay-Houston has proposed to carry out a merger and corporate reorganization under Texas law, whereby the assets of Bay-Houston's Michigan Peat division will, by complying with the Texas merger statute, be deemed owned

by a wholly related limited liability company, Michigan Peat, LLC, a Texas limited liability company, (the "Transaction").

Whereas, in advance of the proposed Transaction,

(a) Bay-Houston has changed its name to Bay-Houston Holdings Co., (accordingly Defendant Bay-Houston shall be referred to herein as "BH Holdings"). BH Holdings ownership (i.e., its shareholders) remains unaltered after its name change;

(b) BH Holdings formed a wholly owned subsidiary Texas limited liability company named Bay-Houston Management, LLC ("BH Management"). One hundred percent (100%) of BH Management is owned by BH Holdings;

(c) BH Management formed two wholly owned subsidiaries named Michigan Peat, LLC ("Michigan Peat, LLC"), a Texas limited liability company and Bay-Houston Towing, LLC, a Texas limited liability company. One hundred percent (100%) of Michigan Peat, LLC is owned by BH Management, and one hundred percent (100%) of Bay-Houston Towing, LLC is also owned by BH Management.

Whereas, following the Transaction, the Michigan Peat division assets and liabilities owned by BH Holdings f/k/a Bay-Houston subject to the Consent Decree

will be owned by Michigan Peat, LLC.  A graphic depiction of the Transaction follows here:



Whereas, in connection with the Transaction, BH Holdings has obtained a modification of the U.S. Department of the Army Permit Number LRE-1992-2760023, authorizing the transfer of such permit from BH Holdings, f/k/a Bay Houston Towing, to Michigan Peat, LLC, and executed permit transfer verification.

Whereas, as set forth in the Unopposed Motion To Modify Consent Decree Regarding Bay-Houston Towing Co. Dated August 11, 2006, ("Motion") filed with this Court, (a) proper notice has been given to Michigan Peat LLC of the Consent Decree; (b) proper notice has been given to the United States of the Transaction, (c) a provision in the Transaction Documents provides that the Project Site is subject to the Consent Decree, (d) Michigan Peat, LLC has consented to become a party to the

Consent Decree, (e) Michigan Peat is the new permittee under the Army Permit Number LRE-1992-2760023, authorizing the transfer of such permit from BH Holdings, f/k/a Bay Houston Towing, to Michigan Peat, LLC, and executed permit transfer verification, and (f) the parties have consented to the Modification of the Consent Decree in the manner provided in this Order, as indicated by the signatures of the parties and counsel below.

Now therefore, in accordance with the forgoing, the Motion is hereby Granted, and the Consent Decree, a copy of which is attached hereto as Exhibit A and incorporated herein by reference, is hereby modified as follows:

1. All references in the Consent Decree (Exhibit A) to Bay-Houston Towing Co. and Bay-Houston shall be read to include Michigan Peat, LLC, and Michigan Peat, LLC shall be deemed a party to the Consent Decree in all respects with the same obligations, responsibilities, and rights as Bay-Houston Towing Co.

2. The Army Permit Number LRE-1992-2760023, authorizing the transfer of such permit from BH Holdings, f/k/a Bay Houston Towing, to Michigan Peat, LLC, and executed permit transfer verification, a copy of which is attached hereto as Exhibit B and incorporated herein by reference, shall become an integral part of the Consent Decree upon entry of this Order.

This is a final order that closes the case.

Dated: May 6, 2024                          s/ Paul D. Borman
                                            Paul D. Borman
                                            United States District Judge

It is hereby stipulated and agreed that the foregoing Order Regarding Modification of Consent Decree may be entered by the Court.

TODD KIM                                    Butzel Long, a professional corporation
Assistant Attorney General


By: _____                By: _____
Andrew J. Doyle                            Attorneys for Defendant
U.S. Department of Justice                 Frederick A. Berg (P38002)
Environment and Natural Resources          150 W. Jefferson Suite 100
Division                                   Detroit, MI 48226
San Francisco Field Office                 313-225-7000
450 Golden Gate Avenue, Suite 07-          berg@butzel.com
6714
San Francisco, CA  94102
(415) 744-6469                             Dated: March 11, 2024
andrew.doyle@usdoj.gov


Dated: April 23, 2024


**Michigan Peat, LLC**, a Texas limited    **Bay-Houston Towing Co., a Texas**
liability company                          **corporation**


By: _____                By: _____
Its: Authorized representative             Its: Authorized representative
Print Name: Matthew Lemieux                Print Name: Matthew Lemieux

Dated: March 11, 2024                       Dated: March 11, 2024

# EXHIBIT A

# CONSENT DECREE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 98-CV-73252 |
| | ) | |
| BAY- HOUSTON TOWING CO., | ) | |
| | ) | |
| Defendant. | ) | |

### CONSENT DECREE

WHEREAS, the Plaintiff, the United States of America, on behalf of the United States

Environmental Protection Agency ("EPA"), filed the Complaint herein against the Defendant,

Bay-Houston Towing Co. ("Bay-Houston"), alleging that Bay-Houston violated Sections 301(a)

and 309(a) of the Clean Water Act ("CWA"), 33 U.S.C. §§ 1311(a), 1319(a);

WHEREAS, the Complaint alleges that Bay-Houston violated CWA Section 301(a) by

discharging dredged or fill material and/or controlling and directing the discharge of dredged or

fill material into waters of the United States at sites located in Sanilac County, Michigan and

more fully described in the Complaint, without a valid Department of the Army permit issued

under Section 404 of the CWA;

WHEREAS, the Complaint alleges that Bay-Houston further violated CWA Section

301(a) by discharging pollutants into waters of the United States at locations more fully

described in the Complaint, without a valid permit issued under Section 402 of the CWA;

WHEREAS, the Complaint alleges that Bay-Houston violated CWA Section 309(a) by

failing to observe the terms of an administrative compliance order ("Order"), issued on

February 9, 1998, which required Bay-Houston to cease unpermitted discharges into specified

waters of the United States, submit a wetlands restoration plan, and give timely notice of its

intent to comply with the Order;

WHEREAS, the Complaint seeks (1) to enjoin the discharge of pollutants into waters of

the United States in violation of CWA Section 301(a), 33 U.S.C. § 1311(a); (2) to require Bay-

Houston, at its own expense and at the direction of the EPA, to restore and/or mitigate the

damage caused by its unlawful activities; and (3) to require Bay-Houston to pay civil penalties as

provided in 33 U.S.C. § 1319(d);

WHEREAS, the Court ruled that the United States is entitled to a judgment on each of

the three counts of the Complaint, and since May 2001, has enjoined Bay-Houston's discharge of

dredged and fill material, except in accordance with CWA Section 404 and Interim Orders issued

by the Court since that date;

WHEREAS, the Court ruled that the United States is not entitled to civil penalties against

Bay-Houston in this action;

WHEREAS, the Court has not yet rendered final judgment;

WHEREAS, Bay-Houston first applied for a Section 404 permit in 1991, in accordance

with the CWA, to cover its peat harvesting operations at Minden, Michigan; applied for and

received coverage under the Section 402 storm water permit program in December of 1994;

terminated all operations at its Minden, Michigan facility during the 1998 harvest season in

response to an administrative compliance order from EPA; applied for a Section 404 permit from

the Corps in 1998; received an individual Section 402 permit on July 24, 1998; operated from

2

1999 to 2005, in accordance with orders and rulings from the Court; and again applied for a Section 404 permit from the Corps in January 2005;

WHEREAS, in response to the January 2005 application, the Corps tendered to Bay-Houston a Section 404 initial proffered permit, Department of the Army Permit No. 92-276-002-3 on September 7, 2005, and Bay-Houston accepted Department of the Army Permit No. 92-276-002-3 on September 26, 2005;

WHEREAS, this Consent Decree is intended to constitute a complete and final settlement of all of the claims of the United States arising out of the Complaint;

WHEREAS, the United States and Bay-Houston (collectively, the "Parties") agree that settlement of all claims is in the public interest and that entry of this Consent Decree is the most appropriate means of resolving the United States's claims in the Complaint against Bay-Houston; and

WHEREAS, the Court finds that this Consent Decree is a reasonable and fair settlement of the claims in the Complaint against Bay-Houston, and that this Consent Decree adequately protects the public interest in accordance with the CWA and all other applicable federal law.

THEREFORE, without further adjudication of any issue of fact or law, and upon consent of the Parties hereto by their authorized representatives, it is hereby ORDERED, ADJUDGED and DECREED as follows:

## I. JURISDICTION AND VENUE

1.     This Court has jurisdiction over the subject matter of this action and over the

Parties pursuant to 28 U.S.C. §§ 1331, 1345, and 1355, and Section 309(b) of the CWA, 33

U.S.C. § 1319(b).

2.     Venue is proper in the Eastern District of Michigan pursuant to CWA Section

309(b), 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1391(b) and (c), because Bay-Houston conducts

business in this District, the subject property is located in this District, and the causes of action

alleged in the Complaint arose in this District.

3.     For purposes of this Consent Decree only, Bay-Houston concedes that the

Complaint states claims upon which relief can be granted pursuant to Sections 301, 309, 402 and

404 of the CWA, 33 U.S.C. §§ 1311, 1319, 1342 and 1344.

## II. APPLICABILITY

4.     This Consent Decree applies to property in Sections 20, 21, 28, and 29,

Township 14N, Range 14E, 7385 Polk Road, Minden City, Michigan, located on Polk Road

approximately 2 miles south of Bay City-Forestville Road (the "Project Site").

5A.    The obligations of this Consent Decree shall apply to and be binding upon the

United States and Bay-Houston, its officers, directors, agents, employees and servants, and its

successors and assigns and any person, firm, association or corporation who is, or will be, acting

in concert or participation with Bay-Houston whether or not such person has notice of this

Consent Decree.  In any action to enforce this Consent Decree against Bay-Houston,

Bay-Houston shall not raise as a defense the failure of any of its officers, directors, agents,

4

employees, successors or assigns or any person, firm, association or corporation who is, or will be, acting in concert or participation with Bay-Houston, to take any actions necessary to comply with the provisions hereof.

5B.    Bay-Houston has executed Department of the Army Permit No. 92-276-002-3, which is attached hereto as Attachment 1.  The terms and conditions set forth in Department of the Army Permit No. 92-276-002-3, including but not limited to the provisions set forth in the "Further Information" and "Specific Conditions" sections of the Permit, are hereby incorporated by reference, are made part of this Consent Decree as if fully set forth herein, and are independently enforceable through this Consent Decree or modification thereof.  It will be within the sole discretion of the United States to enforce Bay-Houston's compliance with Department of the Army Permit No. 92-276-002-3 or any renewal or modification thereof through this Consent Decree and/or through the authority granted under the CWA.

5C.    Upon the renewal or modification of Department of the Army Permit No. 92-276-002-3 issued to Bay-Houston by the Corps for the Project Site, the Parties shall file such permit renewal or modification as an attachment to this Consent Decree and shall submit the Consent Decree, with attachment(s), to the Court for approval as a modification to the Consent Decree, as provided in Section XIII.

6.    Bay-Houston shall transfer ownership or other interest in the Project Site, or a portion of the Project Site, to persons other than the State of Michigan only in accordance with the terms of this paragraph.  At least thirty (30) days prior to the transfer of ownership or other interest in the Project Site, or a portion of the Project Site, including leases, Bay-Houston shall

5

provide written notice and a true copy of this Consent Decree to its successors in interest and shall notify the United States at the addresses specified in Section IX. Any legal instrument conveying an ownership interest or any other interest, including leases, in the Project Site or any portion of the Project Site shall contain a notice stating that the Project Site is subject to this Consent Decree. As a condition to any such transfer, Bay-Houston shall require its transferee to assume all of Bay-Houston's outstanding obligations to implement the terms of this Consent Decree, and shall obtain the consent of its transferee to be made a party to this Consent Decree.

6A.     If the United States does not consent to Bay-Houston's proposed transfer of an ownership interest, or other interest, in the Project Site, Bay-Houston reserves the right to petition the Court to approve the transfer, provided that Bay-Houston demonstrates that the transfer is (a) reasonable and (b) consistent with the purposes of this Consent Decree.

### III. SCOPE OF CONSENT DECREE

7.     This Consent Decree shall constitute a complete and final settlement of all civil claims against Bay-Houston for injunctive relief and civil penalties under the CWA for all activities and omissions alleged in the Complaint or in the record of trial. In the absence of new information available to EPA and/or the Corps indicating that the information provided by Bay-Houston in its permit applications was false, incomplete, or misleading, Bay-Houston's compliance with this Consent Decree, the terms of Department of the Army Permit No. 92-276-002-3, and the section 402 permit issued to Bay-Houston by the State of Michigan on July 24, 1996, Permit #MI0054461, and any renewals of or modifications to either of these permits, shall

6

constitute full compliance with CWA sections 402 and 404 with respect to the activities authorized therein.

8.     It is the express purpose of the United States in entering this Consent Decree, and it is one of Bay-Houston's purposes in executing Department of the Army Permit No. 92-276-002-3, to further the objectives set forth in CWA section 101, 33 U.S.C. § 1251. Bay-Houston's actions pursuant to Department of the Army Permit No. 92-276-002-3 shall have the objective of enabling Bay-Houston to achieve and maintain full compliance with, and to further the objectives of, the CWA.

9.     Upon entry of this Consent Decree by the Court, Bay-Houston and Bay-Houston's agents, successors and assigns are enjoined from discharging any pollutant (as defined by CWA section 502(6), 33 U.S.C. § 1362(6)) and any dredged or fill material (as that term is used in CWA section 404(a), 33 U.S.C. § 1344(a)) into waters of the United States at the Project Site, unless such discharge complies with this Consent Decree, Department of the Army Permit No. 92-276-002-3, the Section 402 permit issued to Bay-Houston by the State of Michigan on July 24, 1996, Permit #MI0054461, and any renewals of or modifications to either of these permits, and further complies with CWA sections 301(a) and 404 and their implementing regulations in all other respects. Bay-Houston shall comply in full with any effective permit issued under the CWA. Upon entry of this Consent Decree, all orders of the Court then in effect, extending the terms of the Court's May 11, 2001 Interim Order, shall be deemed superseded by this Consent Decree and of no further force or effect.

7

9A.     Bay-Houston shall not discharge dredged or fill materials, in non-de minimis amounts, on the Project Site except as authorized by this Consent Decree and/or by Department of the Army Permit No. 92-276-002-3.  Discharges occurring beyond the scope of Department of the Army Permit No. 92-276-002-3, or this Consent Decree, shall be immediately reported to the Corps once discovered.

10.     This Consent Decree is not and shall not be interpreted to be a permit or modification of any existing permit issued pursuant to CWA sections 402 or 404, 33 U.S.C. § 1342 or § 1344, or any other law.  Nothing in this Consent Decree shall limit the authority of the Corps to issue, renew, modify, suspend, revoke or deny any individual Department of the Army permit or any nationwide or regional general Department of the Army permit, nor shall this Consent Decree limit the EPA's ability to exercise its authority pursuant to CWA sections 402(d) and (i) and 404(c), 33 U.S.C. §§ 1342(d), (i) and 1344(c), or the Corps' ability to exercise its authority under CWA section 404(s), 33 U.S.C. § 1344(s).

11.     This Consent Decree in no way affects or relieves Bay-Houston of its responsibility to comply with any applicable federal, state, or local law, regulation or permit.

12.     This Consent Decree in no way affects the rights of the United States or Bay-Houston as against any person not a party to this Consent Decree.

13.     The United States and Bay-Houston reserve any and all legal and equitable remedies to enforce the provisions of this Consent Decree and applicable law.

14.     With the exception of Paragraphs 1, 2, and 3 above, which for the purposes of this Consent Decree Bay-Houston does not contest, nothing in this Consent Decree shall constitute

8

an admission of fact or law by any Party. Bay-Houston and the United States expressly waive

any right to appeal any order entered in this case, including this Consent Decree, provided that

such order was entered on or before the date of entry of this Consent Decree. Bay-Houston and

the United States hereby waive any right to appeal or contest in any manner Department of the

Army Permit No. 92-276-002-3; this sentence does not apply to any renewals or modifications of

Department of the Army Permit No. 92-276-002-3. In the event that any court determines that

the United States does not have regulatory jurisdiction over the Project Site and/or the permitted

activities thereon, Bay-Houston shall only conduct operations on the Project Site in compliance

with Section IV of this Consent Decree.

### IV. RESTORATION, RECLAMATION, MITIGATION AND PRESERVATION & IMPLEMENTATION OF DEPARTMENT OF THE ARMY PERMIT NO. 92-276-002-3

15.     Upon issuance, Department of the Army Permit No. 92-276-002-3, attached

hereto as Attachment 1, authorizes certain previous discharges by Bay-Houston after the fact and

further authorizes Bay-Houston to conduct new work on the Project Site as identified in

Department of the Army Permit No. 92-276-002-3. The after-the-fact and new work authorized

at the Project Site, and the restoration, reclamation, mitigation, and preservation required at the

Project Site, are as follows:

15A.   After-the-Fact Work: Minden North

15A1.  The discharge of an unknown quantity of fill material on approximately six (6)

acres (10,450 linear feet with a base width of 25 feet) for the construction of access roadways in

wetlands between 1977 and 1999.

15A2.  The discharge of an unknown quantity of fill material on approximately 121 acres

9

of wetlands for the construction and operation of a processing plant area.

15A3.   The discharge of an unknown quantity of peat wetland materials dredged from the peat wetlands to create drainage ditches, and dredged from the wetlands in the course of mining operations, and temporarily re-deposited onto peat bog wetlands between 1977 and 2005 on approximately 111.9 acres of peat bog wetlands identified as cells 1A, 2A, 3A, 19A1, 19A2, and 21A (depleted area) (for all cell descriptions, refer to attached Attachment 1).

15A4.   The discharge of an unknown quantity of peat wetland materials dredged from the peat wetlands to create drainage ditches, and dredged from the wetlands in the course of mining operations, and temporarily re-deposited onto peat bog wetlands between 1977 and 2005 on approximately 712 acres (951 total acres after-the-fact minus 121-acre plant area, 111.9-acre depleted area and 6-acre road area) associated with the mining/harvesting of sphagnum and reed sedge peat products from 951 acres of bog.

15B.   New Work: Minden North

15B1.   Continue the discharge of dredged and fill material in conjunction with the mining/harvesting peat from 712 acres of this 951-acre area and operation of the 121-acre plant site.

15B2.   Discharge approximately 191,000 cubic yards of clay obtained from on-site sources (including cells 22A and Clay 2) into approximately 47 acres of peat bog wetlands throughout the Project Site to create approximately 9.0 miles of new access/haul roads as shown on the attached plans (refer to Drawing Numbers 5 and 6 provided in Attachment 1).

15B3.   Discharge approximately 227,165 cubic yards of peat bog material associated

10

with the construction of the drainage ditches necessary to conduct mining/harvesting activities as shown on the attached plans (refer to Drawing Numbers 17 and 18 provided in Attachment 1). New or existing main ditches to be constructed or modified are designated as E/WD2, E/WD5, E/WD6, E/WD7, BED1, and BED2. The E/WD7 ditch will be a new east-west main ditch in the southerly project area. Its southerly edge will be located approximately 300 feet north of the northerly edge of the existing southern ditch, which is identified as E/WD4. New harvest field ditches to be constructed are designated as 10D1, 10D2, 10D3, 10D4, 11D1, 11D2, 11D3, 11D4, 12D2, 12D3, 12D4, and 12D5. Organic material from the newly constructed ditches may be processed as product, discharged for road construction, and/or discharged for ditch-blocking elsewhere on-site where drainage is no longer needed or discharged to augment the remaining substrate in depleted areas.

15B4. After completion of the construction of ditch E/WD7, discharge dredged material to facilitate the construction of a ditch plug in ditches 9D1, 8D1, 7D1, 6D1, 5D1, 4D1, and 3D2 to restore surface hydrological conditions to the Minden Bog south of the existing ditch E/WD4. These plugs shall be installed at the southern terminus of the ditches as close as possible to ditch E/WD4 but avoiding direct adverse impact to unmined bog. A second ditch plug shall be placed in these ditches approximately 100 feet north of the first plug to restore/maintain surface hydrology in the Buffer Zone. Ditch plugs shall consist of sufficient quantities of sapric peat or other suitable native organic material with similar or lesser hydraulic conductivity and permeability. Any of ditches 9D1, 8D1, 7D1, 6D1, 5D1, 4D1, and 3D2 that cannot be plugged at their southern terminus shall be plugged at the northern edge of the Buffer Zone. Final as-

11

built details, plans and appropriate cross sections will be provided by Bay-Houston to the Detroit District Office of the Corps in the first annual report after construction is complete.

15B5.  Discharge dredged material to conduct routine maintenance of existing drainage ditches, roads, and the plant site as necessary to facilitate existing mining operations.  Details of these activities shall be provided by Bay-Houston to the Detroit District Office of the Corps in the appropriate annual report (refer to Paragraph 22).

15B6.  Discharge dredged materials associated with the continuation of the harvest of reed-sedge peat in production cells 4A, 4A1, 4A2, 5A, 6A, 6A1, 22A, 2B, 4B, 5B, 6B, 4C, 5C, and 6C.  A minimum of four (4) feet of reed-sedge peat shall remain throughout these cells at the anticipated completion of mining activities.  The requirement of leaving a minimum of four (4) feet of reed-sedge peat is dependent on the initial presence of at least four (4) feet of reed-sedge peat in cells 4A, 4A1, 4A2, 5A, 6A, 6A1, 22A, 2B, 4B, 5B, 6B, 4C, 5C, and 6C.  Paragraph 24 defines the methodology for establishing a baseline measurement of peat thickness for each cell.

15B7.  In the area immediately south of the 100-foot buffer zone, harvest reed sedge peat on a slope gradient not to exceed one (1) foot vertical drop through ten (10) feet of horizontal distance in cells 4A, 4A1, 5A, and 6A1.

15B8.  Discharge dredged materials associated with the harvest of sphagnum peat from cells 9A, 9B, 9C, 10B, 10C, 11B, 11C, 12B, and 12C to a point where at least one (1) foot of sphagnum peat remains throughout the cells.  The discharge of dredged material associated with the harvest of sphagnum peat within these cells is subject to the 100-foot wide perimeter buffer zone described in Paragraph 20.  In addition, the following gradients and slopes are required for

12

harvesting sphagnum peat from cells 9A, 9C, 10B, 10C, 11B, 12B, and 12C:

      (a)     Starting at the westerly edges of the harvest areas and progressing

eastward in cells 9A, 12B, and 12C (*i.e.*, east of the 100-foot wide buffer area), discharge

dredged materials associated with the harvest of sphagnum peat on a west-to-east slope gradient

not to exceed one (1) foot of vertical drop through ten (10) feet of horizontal distance; and

      (b)     Starting at the northerly edges of the harvest area and progressing

southward in cells 9A, 10B, 11B, and 12B, discharge dredged materials associated with the

harvest of sphagnum peat on a north-to-south slope gradient not to exceed one (1) foot of vertical

drop through ten (10) feet of horizontal distance.

      15B9.  In the transition area identified as cells 7A, 7B, 7C, 8A, 8B, and 8C, discharge

dredged materials associated with the harvest of sphagnum or reed sedge peat.  Starting on the

westerly borders of cells 8A, 8B, and 8C where at least one (1) foot of sphagnum peat remains

and progressing eastward, discharge dredged materials associated with the harvest of peat on a

slope gradient not to exceed one foot (1) of vertical drop through ten (10) feet of horizontal

distance.  A minimum depth of four (4) feet of reed sedge peat must remain at the easterly end of

the slope gradient.

      15B10. East of the transition zone (cells 7A, 7B, 7C, 8A, 8B, and 8C) and north of the

southern project boundary, discharge dredged materials associated with the harvest of peat from

immediately north of the southern 100-foot wide buffer zone along the southern project

boundary on a slope gradient not to exceed one (1) foot of vertical drop through ten (10) feet of

horizontal distance in peat harvest cells 6C, 5C, 4C, C-East 3, C-East 2, C-East 1, and L1.  North

of the new E/WD7 ditch, discharge dredged material associated with the harvest of peat products to a point where a minimum of four (4) feet of reed sedge peat remains throughout harvest cells 6C, 5C, 4C, C-East 3, C-East 2, C-East 1, L1, B East, 6B, 5B, 4B, and 2B.  No harvest of peat products will occur where less than four (4) feet of reed sedge peat currently exists in these cells.

15B11. In cell 20A, discharge dredged materials associated with the harvest of peat from immediately south of the northern 100-foot wide buffer zone along the northern project boundary on a slope gradient not to exceed one (1) foot of vertical drop through ten (10) feet of horizontal distance.  Otherwise, throughout cell 20A, discharge dredged material associated with the harvest of peat products to a point where a minimum of four (4) feet of reed sedge peat remains throughout the harvest cell.

15B12. Bay-Houston anticipates and the United States acknowledges that peat harvesting on the acreage and to the depths described above could take twenty-five (25) to thirty (30) years and thus could encompass multiple extensions of Department of the Army Permit No. 92-276-002-3.  These extensions shall be requested pursuant and subject to all applicable Corps regulations and paragraph 6 of the section entitled "Further Information" in Department of the Army Permit No. 92-276-002-3, and in compliance with the special conditions of Department of the Army Permit No. 92-276-002-3.

15B13. In the event that following the entry of this Consent Decree, Bay-Houston submits any application for authorization to discharge dredged or fill material into waters of the United States at the Project Site, pursuant to CWA Sections 301(a) and 404(a), 33 U.S.C. §§ 1311(a), 1344(a), or in the event that, following the entry of this Consent Decree, it seeks to modify

14

Department of the Army Permit No. 92-276-002-3, Bay-Houston shall not, without first

obtaining the agreement of the United States, seek authorization for any of the following: (a) an

expansion of the areas of the Project Site upon which Bay-Houston is allowed to discharge

dredged and/or fill material in connection with its extraction of peat, beyond the areas identified

in Department of the Army Permit No. 92-276-002-3; or (b) an increase in the depths to which

Bay-Houston can excavate peat or other materials, beyond the depths identified in Department of

the Army Permit No. 92-276-002-3.

  16A. Bay-Houston acknowledges that Department of the Army Permit No. 92-276-002-

3 allows reasonable use of the property, and in consideration for this, a subunit of the property

recognized as Minden North (363.87 acres) designated as cells 10A, 11A, 12A, 13A, 14A, 15A,

16A, 17A, 17A1, 18A, 19A, and 19A3 and the entirety of the property known as Minden South

(819.1 acres) shall remain in its natural condition in perpetuity and not be subject to any

alteration of vegetation, soils, or hydrology by Bay-Houston and any heirs or assigns.  These

parcels shall be transferred by Bay-Houston by warranty deed to the State of Michigan

Department of Natural Resources, subject to an environmental protection conservation easement

and declaration of restrictive covenant as described in Paragraph 16B.  Bay-Houston shall

provide proof of recording of said warranty deed to the Detroit District Office of the Corps, with

copies to the United States, at the addresses specified in Sections V and IX, within 60 days of the

entry of this Consent Decree.  This donation constitutes consideration for entry into this Consent

Decree and further constitutes part of the mitigation for the work authorized in wetlands by

Department of the Army Permit No. 92-276-002-3.  No work authorized by Department of the

Army Permit No. 92-276-002-3 shall take place until the Corps has reviewed the proof of recording and provided a written notice to proceed.

16B.   To ensure that the properties described in Paragraph 16A remain in their natural condition in perpetuity and not be subject to any alteration of vegetation, soils, or hydrology, except to the extent permitted by Department of the Army Permit No. 92-276-002-3, Bay-Houston shall, within sixty (60) days after entry of this Consent Decree, for each parcel of land identified in Paragraph 16A, record, as an integral part of the warranty deed(s) referenced in Paragraph 16A or separately therefrom, an environmental protection conservation easement and restrictive covenant ("conservation easement").  Such conservation easement shall prevent any use of the property that would alter the vegetation, soils, or hydrology of that property after the effective date of the conservation easement.  A copy of the conservation easement to be recorded by Bay-Houston in accordance with this paragraph is attached to this Consent Decree as Attachment 2.  Bay-Houston shall record such a conservation easement(s) with the Register of Deeds Office of Sanilac County, Michigan, in compliance with all real estate recording requirements of Sanilac County and the State of Michigan.  Within fifteen (15) days after recordation of these documents, Bay-Houston shall send proof of the recordation and a copy of the notice recorded to the United States, at the addresses listed in Section IX.

17A.   Additionally, and as further consideration for entry of this Consent Decree and mitigation for the work authorized by Department of the Army Permit No. 92-276-002-3, the acreage authorized for peat harvesting under Department of the Army Permit No. 92-276-002-3, upon completion of all allowable peat harvesting, shall be transferred by Bay-Houston by

16

warranty deed to the State of Michigan Department of Natural Resources, subject to an environmental protection conservation easement and declaration of restrictive covenant, or other appropriate legal instrument, as described in Paragraph 17B. Bay-Houston shall provide proof of recording of said warranty deed to the Detroit District Office of the Corps, with copies to the United States, at the addresses specified in Sections V and IX, within sixty (60) days of the completion of all peat harvesting.

17B.   To ensure that the properties described in Paragraph 17A remain undisturbed, except to the extent permitted by Department of the Army Permit No. 92-276-002-3, Bay-Houston shall, prior to the donation of the property to the State of Michigan, for each parcel of land identified in Paragraph 17A, record, as an integral part of the warranty deed(s) referenced in Paragraph 17A or separately therefrom, an environmental protection conservation easement and restrictive covenant ("conservation easement"), or other appropriate legal instrument. Such conservation easement, or other appropriate legal instrument, shall prevent any use of the property that would interfere with the implementation of all restoration, reclamation, and mitigation activities required by Department of the Army Permit No. 92-276-002-3 and any permit renewals or modifications, as well as prevent any use of the property after all such required restoration, reclamation, and mitigation activities are completed which would disturb the vegetation, soils, or hydrology of that property after the date of completion. The terms of such conservation easement, or other appropriate legal instrument, shall not be inconsistent with the terms of this Consent Decree, and the conservation easement, or other appropriate legal instrument, unless otherwise agreed to in writing by the United States, shall be in substantially

17

the same form as Attachment 2. Bay-Houston shall record these documents with the Register of Deeds Office of Sanilac County, Michigan, in compliance with all real estate recording requirements of Sanilac County and the State of Michigan. Within fifteen (15) days after recordation of these documents, Bay-Houston shall send proof of the recordation and a copy of the notice recorded to the United States, at the addresses listed in Section IX.

18.     Bay-Houston shall establish a capped fund of $1,320,100.00 for the purpose of creating and executing a restoration/reclamation plan and mitigation activities undertaken in connection with peat mining operations on Minden North conducted under Department of the Army Permit No. 92-276-002-3, including renewals and extensions of the permit. This capped fund shall be established within 60 days of the effective date of Department of the Army Permit No. 92-276-002-3. The funds shall be placed in an account with an FDIC insured bank that is approved by the Detroit District Office of the Corps. Prior to the effective date of this Consent Decree, no expenditures may be made from the capped fund, nor may any costs be incurred for subsequent expenditure from the capped fund. Bay-Houston shall cause the periodic statements from the bank account for the capped fund to be sent to the Detroit District Office of the Corps and the United States, at the addresses specified in Sections V and IX. Any interest that accumulates from the capped fund will accrue to the account in which the funds are deposited. Any tax on the interest that accumulates in the capped fund shall be paid from the fund.

19.     Bay-Houston is responsible for minimizing and compensating for long-term unavoidable wetland impacts associated with the extraction of horticultural grade peat from the Minden Bog. Bay-Houston is solely responsible for ensuring the development and

18

implementation of the approved restoration/mitigation proposal up to the limit defined by the capped fund. Any proposals prepared by Bay-Houston shall be sent to the Detroit District Office of the Corps, with copies to the United States, at the addresses specified in Sections V and IX, for review and acceptance by the Corps prior to the initiation of any onsite restoration/mitigation activities. Such proposals shall include projected budgets. The Detroit District Office will review the plans/proposals to replace wetlands lost or offset impacts of the project, the success criteria, and the threshold values for success. If the Corps accepts the proposal, the Corps may still require modifications during the monitoring period as described in Paragraph 24A. Subject to the limit of the capped fund, the reclamation and restoration responsibilities of Bay-Houston are as follows:

(a).     Oversee monies from the capped fund in a manner that ensures that the most efficient use is made of the capped fund in achieving competent reclamation and restoration. The capped fund shall include the following allocations:

(i). $180,000.00 for data gathering, pilot study, and development of a site-wide restoration/reclamation plan.

(ii). $11,000.00 for implementation of restoration on 111.9 acres of the Minden North site already depleted of peat reserves as of the date of entry of this Consent Decree.

(b).     Review available research to determine the best method for successfully restoring/creating the affected peatland areas.

(c).     Develop and implement a comprehensive pilot study of current site

19

conditions to create a specific restoration/reclamation strategy tailored to the needs of the mined areas after the cessation of mining.  An outline for the pilot study must be provided to the Detroit District Office of the Corps, with copies to the United States, at the addresses specified in Sections V and IX, within six (6) months from the effective date of Department of the Army Permit No. 92-276-002-3.

(d).   Implement the appropriate restoration/reclamation strategies upon completion of mining in the various cells.

(e).   Implement demonstration peatland mitigation projects.

(f).   Monitor and oversee all on-site mitigation activities.

(g).   Complete and submit the required monitoring reports as stated in Paragraph 24A.

19A.   No costs associated with this action, or any other litigation, and no attorneys' fees shall be charged against, or deducted from, the capped fund which Bay-Houston is to establish pursuant to Paragraph 18.  Nor shall the costs of any deed transfer, or other costs associated with the actions which Bay-Houston or any other person performs pursuant to Paragraphs 16A, 16B, 17A and 17B, be charged against, or deducted from, the capped fund.

19B.   Bay-Houston shall fulfill the responsibilities prescribed in Paragraph 19 in a manner consistent with any restoration, reclamation, preservation and mitigation plans approved by the Corps for the Project Site.

20.   There shall be a one hundred (100) foot wide buffer zone within which no peat harvesting shall occur along the southerly boundaries of cells L1, C East 1, C East 2, C East 3,

20

4C, 5C, 6C, 7C, 8C, 9C, 10C, 11C, and 12C.  This buffer zone will continue northerly along the western boundary of cells 12C and 12B and then easterly across the northerly boundaries of cells 12B, 11B, and 10B then northerly along the westerly boundary of cell 9A.  The 100-foot wide buffer zone will continue easterly across the northerly edge of cells 9A, 8A,7A, 6A1, 5A, 4A1, 4A, and 22A.  A 100-foot wide buffer zone will also be established along the northerly boundary of cell 20A.  Bay-Houston is encouraged but not required to establish a south to north slope gradient north of the buffer zone along the southerly edge of sphagnum harvest fields 12C, 11C, 10C, and 9C.  The required slope gradient through these cells is from west to east.

21.  Bay-Houston shall ensure that no impacts occur to jurisdictional waters as a result of activities on the Project Site except those authorized by Department of the Army Permit No. 92-276-002-3.  Prior to any land disturbance on the property, the wetland areas that are not to be impacted are to be clearly marked in the field so that the boundaries are clearly visible to equipment operators.  For example, orange construction fencing, silt fencing, and/or continuous strands of flagging can be used to mark buffer zone boundaries.

22.  Bay-Houston shall submit an annual report to the Detroit District Office of the Corps by December 31 of each year, with copies to the United States, at the addresses specified in Sections V and IX, detailing the work accomplished during that year and any work scheduled or anticipated during the coming year.  The annual reports shall include an update of the site development plan; details on areas that were cleared, ditched and/or drained; areas that were actively mined, the amount of material removed from each area, and the estimated depth of peat removed; areas where mining was completed; information on any restoration/reclamation that

21

has been initiated; the proposed operating plan for the upcoming year, including an estimate of the amount to be spent on specific restoration/reclamation planning and/or activities; hydrologic monitoring data (as required in Paragraph 23); and any other pertinent information. Legible maps, drawings, photographs and/or charts shall be included, as appropriate.

22A.   Contemporaneous with its submission of the annual reports required under Paragraph 22, Bay-Houston shall also send to the Detroit District of the Corps and the United States, at the addresses specified in Sections V and IX, an accounting of the monies spent from the capped fund during the same time period covered by the annual report on restoration/reclamation planning and/or activities.  This accounting shall include, at a minimum: (i) a statement of expenditures from the fund during the same time period covered by the annual report, with detailed descriptions of the services or goods obtained with each expenditure and supporting documentation (e.g., invoices), and, (ii) a statement of any interest or other income accumulated by and accrued to the fund during the same time period covered by the annual report.  In addition, if it receives a written request from the United States, Bay-Houston shall have an independent financial audit performed of the capped fund and all expenditures that were made from the capped fund during the same time period covered by the annual report; unless simultaneously delivered to the United States, Bay-Houston shall submit the report of each such audit to the Detroit District Office of the Corps and the United States, at the addresses specified in Sections V and IX, within ten (10) days after such audit is delivered to Bay-Houston.  The cost of any such independent financial audits shall be paid from the fund.

Bay-Houston shall also send to the Detroit District Office of the Corps and the United

22

States, at the addresses specified in Sections V and IX, on a quarterly basis, a statement identifying the expenditures from the capped fund for the previous quarter that includes for each expenditure a description of the services and materials purchased.

At any time, the United States and its representatives and contractors (including but not limited to authorized representatives and contractors of the EPA and Corps), shall also have the authority upon reasonable notice to conduct financial audits of the capped fund at their expense.

23.     Bay-Houston shall prepare and submit a Hydrologic Monitoring Plan ("HMP") prior to any excavation for the perimeter ditches on the eastern, western, and/or southern boundaries of the Project Site.  The purpose of the plan is to outline Bay-Houston's approach to monitoring potential changes in wetland hydrology in areas adjacent to or outside of the harvest areas and project boundaries.  Special emphasis shall be placed on monitoring  hydrologic impacts along the southern perimeter ditch to assess any adverse effects on the ribbed fen south of the Project Site. The HMP shall include: a discussion of existing hydrologic conditions in the area, locations of wells and depths, monitoring frequency, and the format for the monitoring reports.  No excavation of perimeter ditches shall occur until Bay-Houston has received written approval of the HMP from the Corps.

24.     A baseline measurement of peat thickness as applicable to each cell shall be determined in cells 12B, 12C, 11B, 11C, 10B, 10C, 9A, 9B, 9C, 8A, 8B, 8C, 7A, 7B, 7C, 6A, 6A-1, 6B, 6C, 5A, 5B, 5C, 4A, 4A-1, 4A-2, 4B, 4C, 2B, B East, C East 1, C East 2, C East 3, L1, 20A, and 22A prior to the first year of harvest under Department of the Army Permit No. 92-276-002-3.  A sufficient number of measurements shall be made in each cell so that the results

23

are representative of the entire cell.  Measurements shall be recorded and plotted on a scaled cell map with references to the locations where sample measurements were taken.  The results of that baseline measurement shall be provided to the Detroit District Office of the Corps within 60 days of the completion of the measurements.  Additional peat thickness measurements shall be taken by Bay-Houston as needed to ensure that remaining peat thickness limitations are not exceeded.  Sampling shall be conducted by personnel qualified to identify and distinguish between different peat types and soils using equipment commonly utilized in soil boring and sampling.  Sphagnum peat thickness shall be defined as peat meeting the H-1 through H-6 criteria on the von Post scale.  Reed sedge peat thickness shall be defined as peat meeting the H-7 through H-10 criteria on the von Post scale.

    24A.   Annual mitigation monitoring shall be conducted, and annual mitigation monitoring reports on the status of the restoration for each area reclaimed shall be submitted to the Detroit District Office of the Corps, with copies to the United States, at the addresses specified in Sections V and IX, for a minimum of 10 years after the commencement of restoration in that area.  Reports shall be submitted after November 1 and before December 31 each year following the first growing season.  The Detroit District Office of the Corps is responsible for evaluating these reports and monitoring the progress of the restoration/mitigation areas for each year.  Subject to the limit defined by the capped fund, additional monitoring may be required by the Corps if it deems mitigation unsuccessful within the initial 10-year monitoring period.  Subject to the limit defined by the capped fund, Bay-Houston is responsible for correcting any deficiencies within the mitigation monitoring reports and/or within the

24

restored/mitigated areas.  The reports shall, at a minimum, include the following information:

24A1.  All plant species, along with their percent cover, shall be identified using standard transects and plots.  At least one representative plot shall be in each reclaimed area.  In addition, the presence and potential method for removal of any non-native/exotic species shall be documented in the report.

24A2.  Photographs showing all representative areas of the reclamation site taken at least once during each growing season during the period July 1 to September 30.  Photos must be taken from the same reference point and direction of view each reporting year.

24A3.  Groundwater elevations in the restored areas recorded once each month during April through September (frost-free period) of each reported growing season.  The location of each monitoring site shall be shown on a plan view of the site.

24B.   Subject to the limit defined by the capped fund, the restoration on the Project Site shall have the following goals:

24B1.  Hydrology:  Within five (5) years of initiating restoration, each restored area shall meet the hydrology criterion for a wetland as described in the 1987 Corps of Engineers Wetland Delineation Manual.  The restored areas should have soils saturated within 12 inches from the surface; however, open water non-vegetated areas (*e.g.*, ponds, pools, pits, *etc.*) are not authorized in this permit.  This hydrological requirement does not apply to depleted cells 1A, 2A, 3A, 19A1, 19A2, and 21A.

24B2.  Vegetation:  Within five (5) years of initiating restoration, each restored area should be 100% covered with vegetation.  At least 75% of this vegetation cover must contain

live, self-sustaining vegetation typical of bog and fen species including, but not limited to:

*Sphagnum* and other mosses, ericaceous shrubs, and sedges.  In addition, no greater than 5% of

the vegetation cover in the restored areas may consist of invasive/exotic plant species.  Specific

examples of unacceptable invasive/exotic plant species include *Phragmites australis, Lythrum*

*salicaria,* and cattails (*Typha spp.*).  This 100% vegetation requirement does not apply to

depleted cells 1A, 2A, 3A, 19A1, 19A2, and 21A.

        25.    Bay-Houston shall cause the installation of ditch plugs at the Project Site at the

times and locations noted in the project description contained in Department of the Army Permit

No. 92-276-002-3.

        26.    Bay-Houston shall cause the removal of all storage pads, equipment, facilities,

trash, and debris from the plant site building demolition area.  Peat may be used to augment soil

conditions at the Project Site; however, all other excess stockpiled materials must be removed

from the area.  Bay-Houston shall not deduct from the capped fund established pursuant to

Paragraph 18 any costs associated with work required in this Paragraph 26.

## V. NOTICES

27.     All written notices, reports, proposals, proofs of recording and other statements to be provided by Bay-Houston to the Corps under this Consent Decree shall be sent to the following address:  Regulatory Office, Enforcement Branch,  U.S. Army Corps of Engineers, Detroit District Office, P.O. Box 1027, Detroit, MI 48231-1027.  In addition, all other written notices required to be provided by Bay-Houston to the United States under this Consent Decree shall be sent to the addresses specified in Section IX of this Consent Decree.  Either Party may change the identity or address of its notice recipients by sending a notice of such change to the other Party via certified U.S. mail.

## VI. RETENTION OF RECORDS AND RIGHT OF ENTRY

28.     Until the date ten (10) years after Bay-Houston's compliance with Department of the Army Permit No. 92-276-002-3, Bay-Houston shall preserve and retain all records and documents now in its possession or control or which come into its possession or control that relate to Bay-Houston's compliance with Department of the Army Permit No. 92-276-002-3, regardless of any corporate retention policy to the contrary.  Until the date ten years after Bay-Houston's compliance with Department of the Army Permit No. 92-276-002-3, Bay-Houston shall instruct its contractors and agents to preserve all documents, records, and information of whatever kind, nature or description relating to the performance of the tasks undertaken in accordance with implementing Department of the Army Permit No. 92-276-002-3.

27

29.   At the conclusion of the document retention period, Bay-Houston shall notify the United States at least ninety (90) days prior to the destruction of any records or documents in its possession or control, and, upon request by the United States, Bay-Houston shall deliver any such records or documents to the EPA. Bay-Houston may assert that certain documents, records and other information are privileged under the attorney-client privilege or any other privilege recognized by federal law. If Bay-Houston asserts such a privilege, it shall provide the United States with the following: (1) the title of the document, record, or information; (2) the date of the document, record, or information; (3) the name and title of the author of the document, record, or information; (4) the name and title of each addressee and recipient; (5) a description of the subject of the document, record, or information; and (6) the privilege and the basis therefore asserted by Bay-Houston. However, no documents, reports or other information created or generated pursuant to the requirements of Bay-Houston's compliance with Department of the Army Permit No. 92-276-002-3 shall be withheld on the grounds that they are privileged.

30.   The United States and its representatives and contractors (including but not limited to authorized representatives and contractors of the EPA and Corps), shall have authority at all reasonable times to enter the Project Site to:

(a).   Monitor the activities required by Department of the Army Permit No. 92-276-002-3, including any renewals or modifications thereof;

(b).   Verify any data or information submitted to the United States that

28

otherwise pertain to the implementation of the restoration/mitigation activities which are to be implemented pursuant to Department of the Army Permit No. 92-276-002-3, including any renewals or modifications thereof;

      (c).    Obtain samples, data, or other information necessary to evaluate compliance with Department of the Permit No. 92-276-002-3, including any renewals or modifications thereof;

      (d).    Inspect and evaluate the restoration and/or mitigation activities which are to be implemented pursuant to Department of the Army Permit No. 92-276-002-3, including any renewals or modifications thereof;

      (e).    Inspect and review any records required to be kept under the terms and conditions of Department of the Army Permit No. 92-276-002-3, including any renewals or modifications thereof;

      (f).    Inspect and evaluate whether the Project Site is being used in a manner that is prohibited by Department of the Army Permit No. 92-276-002-3, including any renewals or modifications thereof; and

      (g).    Monitoring Bay-Houston's compliance with the terms and conditions of this Consent Decree and Department of the Army Permit No. 92-276-002-3, including any renewals or modifications thereof.

29

Bay-Houston represents that it has authority to grant access to the Project Site as provided in Paragraph 30.

31.     The provisions of Paragraph 30 above are in addition to, and in no way limit or otherwise affect, the statutory authorities of the United States to conduct inspections, to require monitoring, and to obtain information from Bay-Houston as authorized by law.

VII.  STIPULATED PENALTIES

32.     After the entry of this Consent Decree, Bay-Houston shall pay a stipulated penalty for the failure to timely fulfill certain requirements of this Consent Decree, including Department of the Army Permit No. 92-276-002-3, as specified in Paragraphs 33, 33A and 33B.

33.     For each instance of noncompliance, or failure to timely comply, as specified in Paragraph 33A, Bay-Houston shall pay the per day penalty designated in Paragraph 33B for each day that the noncompliance continues:

33A.   (a).    Failure to ensure transfer of Minden South, or any subunit of the property known as Minden North, to the State of Michigan in the manner and within the time period specified in Paragraph 16A of this Consent Decree.

(b).    Failure to ensure the transfer to the State of Michigan, of all acreage authorized for peat harvesting under Department of the Army Permit No. 92-276-002-3, in the manner and within the time period specified in Paragraph 17A of this Consent Decree.

(c).    Failure to establish a capped fund in the full amount of $1,320,100 in the manner, and within the time, specified in Paragraph 18 of this Consent Decree.

30

(d).    Performing any excavation of any perimeter ditch at the Project Site prior to receiving the written approval of the Corps of the Hydrological Monitoring Plan which Bay-Houston is required to submit to the Corps, pursuant to Paragraph 23 of this Consent Decree.

(e).    Prior to any land disturbance by Bay-Houston on the Project Site, failure to mark wetland areas that are not to be impacted as required under this Consent Decree and Department of the Army Permit No. 92-276-002-3, unless otherwise authorized by the Corps in writing.

(f)     Failure to provide to the Detroit District of the Corps, with copies to the United States, at the addresses specified in Sections V and IX, an outline for a comprehensive pilot study of current site conditions within six (6) months from the effective date of Department of the Army Permit No. 92-276-002-3, as required by this Consent Decree and Department of the Army Permit No. 92-276-002-3, attached hereto;

(g).    Failure to submit any of the first ten (10) annual mitigation monitoring reports required by Department of the Army Permit No. 92-276-002-3 by the deadlines set by the Corps.

33B.    For Day 31 up to and including        $ 750.00 per day
        Day 60 of noncompliance

        For Day 61 up to and including        $1500.00 per day
        Day 121 of noncompliance

        For Day 122 of noncompliance          $2500.00 per day
        and beyond

34.     Bay-Houston shall not be obligated to pay any stipulated penalty until it receives a specific written demand for such payment from the United States.  Upon receipt of such a demand, Bay-Houston shall submit payment to the United States within 30 days of receipt, unless a longer time period is provided in the demand, or unless Bay-Houston, before the date that payment is due, files a motion with the Court for a ruling as to whether Bay-Houston has violated the provision or provisions of the Consent Decree at issue.

35.     The filing of a motion in accordance with Paragraph 34 shall stay Bay-Houston's obligation to pay any stipulated penalties with regard to the disputed matter pending resolution of the dispute by the Court.  In the event that Bay-Houston does not prevail on the disputed issue, stipulated penalties shall be paid by Bay-Houston within the time period ordered by the Court.

36.     To the extent Bay-Houston prevails on any motion filed in accordance with Paragraph 34, concerning its alleged noncompliance or failure to timely comply, the Court shall excuse stipulated penalties for each such instance addressed in such motion.

37.     In the event that a stipulated penalty payment is applicable and is not made on time, interest shall be paid in accordance with the statutory judgment interest rate provided for in 28 U.S.C. § 1961.  Interest shall be computed daily from the time payment is first due until the date payment is made.  Interest shall be compounded annually.

38.     Bay-Houston shall make any payment of a stipulated penalty by FedWire Electronic Funds Transfer ("EFT" or wire transfer) to the U.S. Department of Justice account in accordance with current electronic funds transfer procedures, referencing the U.S.A.O. file

32

number provided by the United States to Bay-Houston prior to payment, EPA Region 5 and the

DOJ case number 90-5-1-1-4519.  Payment shall be made in accordance with instructions

provided to Bay-Houston by the Financial Litigation Unit of the United States Attorney's Office

for the Eastern District of Michigan.  Any payments received by the Department of Justice after

4:00 P.M. (Eastern Time) will be credited on the next business day.  Further, upon payment of

any stipulated penalties, Bay-Houston shall provide written notice to the addresses specified in

Section IX of this Decree.

### VIII.  FORCE MAJEURE

38A.    The Defendant shall perform the actions required under this Consent Decree

within the time limits set forth or approved herein, unless the performance is prevented or

delayed solely by events which constitute a Force Majeure event.  A Force Majeure event is

defined as any unexpected event arising from causes beyond the control of the Defendant,

including its employees, agents, consultants and contractors, which could not be overcome by

due diligence and which delays or prevents the performance of an action required by this

Consent Decree within the specified time period.  A Force Majeure event does not include, inter

alia, increased costs of performance, changed economic circumstances, changed labor relations,

normal precipitation or climate events, changed circumstances arising out of the sale, lease or

other transfer or conveyance of title or ownership or possession of the Site, or failure to obtain

federal, state or local permits.

38B.    If the Defendant believes that a Force Majeure event has affected the Defendant's

ability to perform any action required under this Consent Decree, the Defendant shall notify the

33

United States in writing within seven (7) calendar days of the event at the addresses listed in Section IX.  Such notice shall include a discussion of the following:

    A.    what action has been affected;

    B.    the specific cause(s) of the delay;

    C.    the length or estimated duration of the delay; and

    D.    any measures taken or planned by the Defendant to prevent or minimize the delay and a schedule for the implementation of such measures.

The Defendant may provide to the United States any additional information that it deems appropriate to support its conclusion that a Force Majeure event has affected its ability to perform an action required under this Consent Decree.  Failure to provide timely and complete notification to the United States shall constitute a waiver of any claim of Force Majeure as to the event in question.

38C.   If the United States determines that the conditions constituted a Force Majeure event, then the deadline for completion of the affected action shall be extended by the amount of time of the delay caused by the Force Majeure event.  The Defendant shall coordinate with the United States to determine when to begin or to resume the operations that had been affected by any Force Majeure event.

38D.   If the Parties are unable to agree as to whether the conditions constituted a Force Majeure event, or as to whether the length of time for fulfilling the provision of the Consent Decree at issue should be extended, either Party may file a motion with the Court.

34

38E.    The Defendant shall bear the burden of proving, by a preponderance of the evidence, (1) that the noncompliance at issue was caused by circumstances entirely beyond the control of the Defendant and any entity controlled by the Defendant, including its contractors and consultants; (2) that the Defendant or any entity controlled by the Defendant could not have foreseen and prevented such noncompliance; and (3) the number of days of noncompliance that were caused by such circumstances.

## IX.  ADDRESSES

39.    All notices and communications required under this Consent Decree shall be made to the Parties to each of the following persons and addresses:

A.    TO THE EPA:

(1)    Jacqueline Miller
Associate Regional Counsel
United States Environmental Protection Agency
Region 5 (C-14J)
77 West Jackson Boulevard
Chicago, IL 60604

(2)    David Schulenberg
United States Environmental Protection Agency
Region 5, Water Division (WW-16J)
77 West Jackson Boulevard
Chicago, IL 60604

B.    TO THE UNITED STATES DEPARTMENT OF JUSTICE

Chief
Environmental Defense Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986
Re: DJ # 90-5-1-1-4519

35

C.    TO BAY-HOUSTON:

> Steven D. Weyhing, Esq.
> Kelley Cawthorne, PLLC
> 101 South Washington – 9th Floor
> Lansing, MI 48933

## X.  COSTS OF SUIT

40.    The Parties shall bear their own costs and attorneys' fees in this action.

## XI.  PUBLIC COMMENT

41.    The Parties acknowledge that after the lodging and before the entry of this

Consent Decree by the Court, final approval by the United States is subject to the requirements

of 28 C.F.R. § 50.7, which provides for public notice and comment.  The United States reserves

the right to withhold or withdraw its consent to the entry of this Consent Decree if the comments

received disclose facts which lead the United States to conclude that the proposed judgment is

inappropriate, improper, or inadequate.  Bay-Houston agrees to entry of this Consent Decree

without further notice or consent.

## XII.  CONTINUING JURISDICTION OF THE COURT

42.    This Court shall retain jurisdiction over this action in order to enforce or modify

this Consent Decree for the duration of the performance of the terms and provisions of this

Consent Decree, consistent with applicable law or to resolve all disputes arising hereunder and

as may be necessary or appropriate for construction or execution of this Consent Decree and for

enforcing compliance with its terms and provisions.  During the pendency of the Consent

Decree, any Party may apply to the Court for any relief necessary to construe and effectuate the

36

Consent Decree.  Any motions made by a Party to terminate this Consent Decree shall be in

writing and shall be served upon the Court and all Parties to this Consent Decree.

## XIII. MODIFICATION

43.    Upon its entry by the Court, this Consent Decree shall have the force and effect of

a final judgment.  Any modification of this Consent Decree shall be in writing, and shall not take

effect unless signed by both the United States and Bay-Houston and approved by the Court.

IT IS SO ORDERED.

Dated and entered this _11th_ day of _August_ 2006.

United States District Judge

37

ON BEHALF OF THE UNITED STATES:


SUE ELLEN WOOLDRIDGE
Assistant Attorney General
Environment and Natural Resources Division

Dated: August 3, 2006

Joshua M. Levin
Andrew J. Doyle
Environmental Defense Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 23986
Washington, D.C. 20026-3986
(202) 514-4198 (t)
(202) 514-4428 (t)

38

Mark Pollins
Division Director
Water Enforcement Division
Office of Enforcement and Compliance Assurance
United States Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, D.C. 20460

Dated: 6/16/06

39

Dated: June 6, 2006

Jacqueline Miller
Associate Regional Counsel
United States Environmental Protection Agency
Region 5
77 West Jackson Boulevard
Chicago, IL 60604

Dated: 6-13-06

Bharat Mathur
Acting Regional Administrator
United States Environmental Protection Agency
Region 5
77 West Jackson Boulevard
Chicago, IL 60604

40

FOR BAY-HOUSTON TOWING CO.

*[signature]*                                          Dated: 6/6/06

Steven D. Weyhing
Kelley Cawthorne, PLLC
101 S. Washington Square - 9th Floor
Lansing, Michigan 48933

*[signature]*  (per R s/w)                            Dated: 6/6/06

John H. Dudley, Jr.
Butzel Long
Suite 100, 150 West Jefferson
Detroit, MI  48226-4450

*[signature]*                                          Dated: 6/5/06

J. David Newman
Vice President and General Manager
Michigan Peat Division
Bay-Houston Towing Co.
2243 Milford
Houston, TX 77098

41

EXHIBIT B

Modification of the U.S. Department of the Army Permit Number LRE-1992-2760023, authorizing the transfer of such permit from BH Holdings, f/k/a Bay-Houston Towing, to Michigan Peat, LLC, and executed permit transfer verification



**DEPARTMENT OF THE ARMY**
**U.S. ARMY CORPS OF ENGINEERS, DETROIT DISTRICT**
**477 MICHIGAN AVENUE**
**DETROIT MI 48226-2550**

February 7, 2024

Regulatory Branch
File No. LRE-1992-2760023

David Newman
PO Box 980129
Houston, Texas  77098-0129

Dear Mr. Newman:

Please refer to the January 19, 2024 permit transfer request, submitted on your behalf by Susan L. Johnson of Butzel Long, for the transfer of Department of the Army (DA) Permit Number LRE-1992-2760023 from Bay Houston Towing (primary contact: David Newman) to Michigan Peat, LLC (primary contact: David Newman).

This letter serves to reflect that Michigan Peat, LLC (primary contact: David Newman) is the new permittee of Federal Permit No. LRE-1992-2760023 (copy enclosed).  It is suggested that a copy of this transfer letter be kept for the records of all parties involved.  In our records, Michigan Peat, LLC (primary contact: David Newman), has been recorded as the permittee and has assumed the obligation of complying with all terms and conditions of the permit.

Should you have any questions on this matter, please contact Laura Garrett at the above address, by E-Mail at Laura.A.Garrett@usace.army.mil, or by telephone at (313) 226-1327.  In all communications, please refer to File Number LRE-1992-2760023.

Sincerely,

Donald T. Reinke
Chief, Compliance & Enforcement Section
Regulatory Branch

Enclosures

Copy Furnished:
Susan L. Johnson/Butzel Long
Andrew Doyle/USDOJ
Erik Olsen/USEPA
Dan Bock/MI AG
Jacob Brand/EGLE
Brian Rudolph/EGLE

# DEPARTMENT OF THE ARMY PERMIT

**Permittee:**  Bay-Houston Towing Co./Michigan Peat Division

**Permit No.** 92-276-002-3

**Issuing Office:** U.S. Army Engineer District, Detroit

N**O**TE: The term "you" and its derivatives, as used in this permit, means the permittee or any future transferee. The term "this office" refers to the appropriate district or division office of the Corps of Engineers having jurisdiction over the permitted activity or the appropriate official of that office acting under the authority of the commanding officer.

Your after-the-fact work as described below is authorized and you are authorized to perform continuing and new work in accordance with the terms and conditions specified below.

**Project Description:**

After-the-Fact: Minden North

The discharge of an unknown quantity of fill material on approximately six (6) acres (10,450 linear feet with a base width of 25 feet) for the construction of access roadways in wetlands between 1977 and 1999.

The discharge of an unknown quantity of fill material into approximately 121 acres of wetlands for the construction and operation of a processing plant area.

The discharge of an unknown quantity of peat wetland materials dredged from the peat wetlands to create drainage ditches, and dredged from the wetlands in the course of mining operations, and temporarily re-deposited onto peat bog wetlands between 1977 and 2005 on approximately 111.9 acres of peat bog wetlands identified as cells 1A, 2A, 3A, 19A1, 19A2, and 21A (depleted area).

The discharge of an unknown quantity of peat wetland materials dredged from the peat wetlands to create drainage ditches, and dredged from the wetlands in the course of mining operations, and temporarily re-deposited onto peat bog wetlands between 1977 and 2005 on approximately 712 acres (951 total acres after-the-fact minus 121-acre plant area, 111.9-acre depleted area and 6-acre road area) associated with the mining/harvesting of sphagnum and reed sedge peat products from 951 acres of bog.

New Work: Minden North

Continue the discharge of dredged and fill material in conjunction with the mining/harvesting peat from 712 acres of this 951-acre area and operation of the 121-acre plant site.

Discharge approximately 191,000 cubic yards of clay obtained from on-site sources (including cells 22A and Clay 2) into approximately 47 acres of peat bog wetlands throughout the site to create approximately 9.0 miles of new access/haul roads as shown on the attached plans (refer to Drawing Nos. 5 and 6).

Discharge approximately 227,165 cubic yards of peat bog material associated with the construction of the drainage ditches necessary to conduct mining/harvesting activities as shown on the attached plans (refer to Drawing Nos. 17 and 18). New or existing main ditches to be constructed or modified are designated as E/WD2, E/WD5, E/WD6, E/WD7, BED1, and BED2. The E/WD7 ditch will be a new

**ENG FORM 1721, Nov 86**          EDITION OF SEP 82 IS OBSOLETE.          *(33 CFR 320-330)*

east-west main ditch in the southerly project area. Its southerly edge will be located approximately 300 feet north of the northerly edge of the existing southern ditch, which is identified as E/WD4. New harvest field ditches to be constructed are designated as 10D1, 10D2, 10D3, 10D4, 11D1, 11D2, 11D3, 11D4, 12D2, 12D3, 12D4, and 12D5. Organic material from the newly constructed ditches may be processed as product, discharged for road construction, and/or discharged for ditch-blocking elsewhere on-site where drainage is no longer needed or discharged to augment the remaining substrate in depleted areas.

After completion of the construction of ditch E/WD7, discharge dredged material to facilitate the construction of a ditch plug in ditches 9D1, 8D1, 7D1, 6D1, 5D1, 4D1, and 3D2 to restore surface hydrological conditions to the Minden Bog south of the existing ditch E/WD4. These plugs shall be installed at the southern terminus of the ditches as close as possible to ditch E/WD4 but avoiding direct adverse impact to unmined bog. A second ditch plug shall be placed in these ditches approximately 100 feet north of the first plug to restore/maintain surface hydrology in the Buffer Zone. Ditch plugs shall consist of sufficient quantities of sapric peat or other suitable native organic material of with similar or lesser hydraulic conductivity and permeability. Any of ditches 9D1, 8D1, 7D1, 6D1, 5D1, 4D1, and 3D2 that cannot be plugged at their southern terminus shall be plugged at the northern edge of the Buffer Zone. Final as-built details, plans and appropriate cross sections will be provided to this office in the first annual report after construction is complete.

Discharge dredged material to conduct routine maintenance of existing drainage ditches, roads, and the plant site as necessary to facilitate existing mining operations. Details of these activities shall be provided to this office in the appropriate annual report (refer to Special Condition No. 8).

Discharge dredged materials associated with the continuation of the harvest of reed-sedge peat in production cells 4A, 4A1, 4A2, 5A, 6A, 6A1, 22A, 2B, 4B, 5B, 6B, 4C, 5C, and 6C. A minimum of four (4) feet of reed-sedge peat shall remain throughout these cells at the anticipated completion of mining activities. The requirement of leaving a minimum of four (4) feet of reed-sedge peat is dependent on the initial presence of at least four (4) feet of reed-sedge peat in cells 4A, 4A1, 4A2, 5A, 6A, 6A1, 22A, 2B, 4B, 5B, 6B, 4C, 5C, and 6C. Special Condition No. 10 defines the methodology for establishing a baseline measurement of peat thickness for each cell.

In the area immediately south of the 100-foot buffer zone, harvest reed sedge peat on a slope gradient not to exceed one (1) foot vertical drop through ten (10) feet of horizontal distance in cells 4A, 4A1, 5A, and 6A1.

Discharge dredged materials associated with the harvest of sphagnum peat from cells 9A, 9B, 9C, 10B, 10C, 11B, 11C, 12B, and 12C to a point where at least one (1) foot of sphagnum peat remains throughout the cells. The discharge of dredged material associated with the harvest of sphagnum peat within these cells is subject to the 100-foot wide perimeter buffer zone described in Special Condition No. 6 and documented in Drawing No. 7. In addition, the following gradients and slopes are required for harvesting sphagnum peat from cells 9A, 9C, 10B, 10C, 11B, 12B, and 12C: I) Starting at the westerly edges of the harvest areas and progressing eastward in cells 9A, 12B, and 12C (*i.e.*, east of the 100-foot wide buffer area), discharge dredged materials associated with the harvest of sphagnum peat on a west-to-east slope gradient not to exceed one (1) foot of vertical drop through ten (10) feet of horizontal distance; and II) Starting at the northerly edges of the harvest area and progressing southward in cells 9A, 10B, 11B, and 12B, discharge dredged materials associated with the harvest of sphagnum peat on a north-to-south slope gradient not to exceed one (1) foot of vertical drop through ten (10) feet of horizontal distance.

In the transition area identified as cells 7A, 7B, 7C, 8A, 8B, and 8C, discharge dredged materials associated with the harvest of sphagnum or reed sedge peat. Starting on the westerly borders of cells 8A, 8B, and 8C where at least one (1) foot of sphagnum peat remains and progressing eastward, discharge

dredged materials associated with the harvest of peat on a slope gradient not to exceed one foot (1) of vertical drop through ten (10) feet of horizontal distance. A minimum depth of four (4) feet of reed sedge peat must remain at the easterly end of the slope gradient.

East of the transition zone (cells 7A, 7B 7C, 8A, 8B, and 8C) and north of the southern project boundary, discharge dredged materials associated with the harvest of peat from immediately north of the southern 100-foot wide buffer zone along the southern project boundary on a slope gradient not to exceed one (1) foot of vertical drop through ten (10) feet of horizontal distance in peat harvest cells 6C, 5C, 4C, C-East 3, C-East 2, C-East 1, and L1. North of the new E/WD7 ditch, discharge dredged material associated with the harvest of peat products to a point where a minimum of four (4) feet of reed sedge peat remains throughout harvest cells 6C, 5C, 4C, C-East 3, C-East 2, C-East 1, L1, B East, 6B, 5B, 4B, and 2B. No harvest of peat products will occur where less than four (4) feet of reed sedge peat currently exists in these cells.

In cell 20A, discharge dredged materials associated with the harvest of peat from immediately south of the northern 100-foot wide buffer zone along the northern project boundary on a slope gradient not to exceed one (1) foot of vertical drop through ten (10) feet of horizontal distance. Otherwise, throughout cell 20A, discharge dredged material associated with the harvest of peat products to a point where a minimum of four (4) feet of reed sedge peat remains throughout the harvest cell.

The permittee anticipates and the Corps acknowledges that peat harvesting on the acreage and to the depths described herein could take twenty-five (25) to thirty (30) years and thus could encompass multiple extensions pursuant and subject to paragraph 6 of the section entitled "Further Information" and compliance with the special conditions.

**Project Location:** in wetlands adjacent to the Black River (Sanilac Co.), on wetland property in Sections 20, 21, 28, AND 29, Township 14N, Range 14E, 7385 Polk Road Minden City, MI Minden City, Michigan, located on Polk Road approximately 2 miles south of Bay City-Forestville Road.

Permit Conditions:

General Conditions:

1. The time limit for completing the work authorized ends on **December 31, 2015.** If you find that you need more time to complete the authorized activity, submit your request for a time extension to this office for consideration at least one month before the above date is reached.

2. You must maintain the activity authorized by this permit in good condition and in conformance with the terms and conditions of this permit. You are not relieved of this requirement if you abandon the permitted activity, although you may make a good faith transfer to a third party in compliance with General Condition 4 below. Should you wish to cease to maintain the authorized activity or should you desire to abandon it without a good faith transfer, you must obtain a modification of this permit from this office, which may require restoration of the area.

3. If you discover any previously unknown historic or archeological remains while accomplishing the activity authorized by this permit, you must immediately notify this office of what you have found. We will initiate the Federal and state coordination required to determine if the remains warrant a recovery effort or if the site is eligible for listing in the National Register of Historic Places.

4. If you sell the property associated with this permit, you must obtain the signature of the new owner in the space provided and forward a copy of the permit to this office to validate the transfer of this authorization.

5. If a conditioned water quality certification has been issued for your project, you must comply with the conditions specified in the certification as special conditions to this permit. For your convenience, a copy of the certification is attached if it contains such conditions.

6. You must allow representatives from this office to inspect the authorized activity at any time deemed necessary to ensure that it is being or has been accomplished in accordance with the terms and conditions of your permit.

Special Conditions:

1. Your signature, as permittee, indicates that, as consideration for the issuance of this permit, you voluntarily accept and agree to comply with all of the terms and conditions of this permit.

2. The permittee acknowledges that this permit allows reasonable use of the property, and in consideration for this, a subunit of the property recognized as Minden North (370.1 acres) designated as cells 10A, 11A, 12A, 13A, 14A, 15A, 16A, 17A, 17A1, 18A, 19A, and 19A3 (denoted as the "Conservation Easement/ Donation Area" on attached drawings) and the entirety of the property known to as Minden South (819.1 acres) will remain in its natural condition in perpetuity and not be subject to any alteration of vegetation, soils, or hydrology by the permittee and any heirs or assigns. These parcels will be transferred by deed to the State of Michigan Department of Natural Resources. The permittee shall provide proof of recording of this deed to this office within 60 days of the issuance of this permit. This donation constitutes part of the mitigation for the work authorized in wetlands by this permit. Work shall not take place until this office has reviewed the proof and provided a written notice to proceed. Additionally and as further mitigation for the work authorized, the acreage for authorized peat harvesting under this permit shall, upon completion of all peat harvesting, be transferred by deed to the State of Michigan Department of Natural Resources.

3. The harvest/mining of sphagnum peat products shall be by the process known as milling, which involves ditching to carry away excess water, clearing the surface of living vegetation and woody debris, disking of the sphagnum and utilizing vacuum harvesters to collect the dried peat. Open cast methods (stockpiling) using bulldozers, front-end loaders and dump trucks are authorized for the harvest/mining for reed-sedge peat materials. This is the methodology already in use on the site. Any changes in the methodology shall first be reviewed and approved by this office.

4. The permittee shall establish a capped fund of $1,320,100.00 for the purpose of creating and executing a restoration/reclamation plan and mitigation activities undertaken in connection with peat mining operations on Minden North conducted under this permit, including renewals and extensions of this permit. This fund shall be established within 60 days of the issuance and acceptance of this permit. The funds shall be placed in an account with an FDIC insured bank that is approved by this office. Any interest that accumulates from these funds will accrue to the account in which the funds are deposited. Any tax on the interest that accumulates in the capped fund shall be paid from the fund.

5. The permittee is responsible for minimizing and compensating for long-term unavoidable wetland impacts associated with the extraction of horticultural grade peat from the Minden Bog. To ensure competent restoration of the mined areas and to make the most efficient use of the capped fund, we have no objection to your proposal to establish a "Restoration/Reclamation Committee" (committee) when creating, implementing, and monitoring a proposed restoration/mitigation plan. Any proposals prepared by the permittee and/or the committee must be reviewed and accepted by this office prior to the initiation of any onsite restoration/mitigation activities. We will review the plans/proposal to replace wetlands lost or offset impacts of the project, the success criteria, and the threshold values for success. If we accept the proposal, we may still require modifications during the monitoring periods as described in Special Condition No. 11. The permittee is solely responsible for ensuring the development and implementation of the approved restoration/mitigation proposal up to the limit defined by the capped fund.

Subject to the limit of the capped fund, the responsibilities of the permittee are as follows:

    a.  Oversee monies from the capped fund including the following allocations:

        1.  $180,000.00 for data gathering, pilot study, and development of a site-wide restoration/reclamation plan.

        2.  $11,000.00 for implementation of restoration on 110 acres of the Minden North site already depleted of peat reserves.

    b.  Review available research to determine the best method for successfully restoring/creating the affected peatland areas.

    c.  Develop and implement a comprehensive pilot study of current site conditions to create a specific restoration/reclamation strategy tailored to the needs of the mined areas after the cessation of mining. An outline for the pilot study must be provided to this office within six (6) months from the issuance of this permit.

    d.  Implement the appropriate restoration/reclamation strategies upon completion of mining in the various cells.

    e.  Implement demonstration peatland mitigation projects.

    f.  Monitor and oversee all on-site mitigation activities.

    g.  Complete and submit the required monitoring reports as stated in Special Condition No. 11.

6. There shall be a one hundred (100) foot wide buffer zone within which no peat harvesting shall occur along the southerly boundaries of cells L1, C East 1, C East 2, C East 3, 4C, 5C, 6C, 7C, 8C, 9C, 10C, 11C, and 12C. This buffer zone will continue northerly along the western boundary of cells 12C and 12B and then easterly across the northerly boundaries of cells 12B, 11B, and 10B then northerly along the westerly boundary of cell 9A. The 100-foot wide buffer zone will continue easterly across the northerly edge of cells 9A, 8A, 7A, 6A1, 5A, 4A1, 4A, and 22A. A 100-foot wide buffer zone will also be established along the northerly boundary of cell 20A. The permittee is encouraged but not required to establish a south to north slope gradient north of the buffer zone along the southerly edge of sphagnum harvest fields 12C, 11C, 10C, and 9C. The required slope gradient through these cells is from west to east.

7. It is the responsibility of the permittee to ensure that no additional impacts occur to jurisdictional waters on the project site except those authorized by this permit. Prior to any land disturbance on the property, the wetland areas that are not to be impacted are to be clearly marked in the field so that the boundaries are clearly visible to equipment operators. For example, orange construction fencing, silt fencing, and/or continuous strands of flagging can be used to mark buffer zone boundaries.

8. The permittee shall submit an annual report to this office by December 31 each year detailing the work accomplished during that year and any work scheduled or anticipated during the coming year. The reports shall include an update of the site development plan; details on areas that were cleared, ditched and/or drained; areas that were actively mined, the amount of material removed from each area, and the estimated depth of peat removed; areas where mining was completed; information on any reclamation that has been initiated; the proposed operating plan for the upcoming year; hydrologic monitoring data (as required in Special Condition 9), and any other pertinent information. Legible maps, drawings, photographs and/or charts shall be included, as appropriate.

9. The permittee shall prepare and submit a Hydrologic Monitoring Plan (HMP) prior to any excavation for the perimeter ditches on the eastern, western, and/or southern boundaries of the site. The purpose of the plan is to outline the permittee's approach to monitoring potential changes in wetland hydrology in areas adjacent to or outside of the harvest areas and project boundaries. Special emphasis shall be placed on monitoring hydrologic impacts along the southern perimeter ditch to assess any adverse effects on the ribbed fen south of the site. The HMP shall include: a discussion of existing hydrologic conditions in the area, locations of wells and depths, monitoring frequency, and the format for the monitoring reports. No excavation of perimeter ditches shall occur until the permittee has received written approval of the HMP from this office.

10.  A baseline measurement of peat thickness as applicable to each cell shall be determined in cells 12B, 12C, 11B, 11C, 10B, 10C, 9A, 9B, 9C, 8A, 8B, 8C, 7A, 7B, 7C, 6A, 6A-1, 6B, 6C, 5A, 5B, 5C, 4A, 4A-1, 4A2, 4B, 4C, 2B, B East, C East 1, C East 2, C East 3, L1, 20A, and 22A prior to the first year of harvest under this permit.  A sufficient number of measurements shall be made in each cell so that the results are representative of the entire cell.  Measurements shall be recorded and plotted on a scaled cell map with references to the locations where sample measurements were taken.  The results of that baseline measurement shall be provided to this office within 60 days of the completion of the measurements.  Additional peat thickness measurements shall be taken by the permittee as needed to ensure that remaining peat thickness limitations are not exceeded.  Sampling shall be conducted by personnel qualified to identify and distinguish between different peat types and soils using equipment commonly utilized in soil boring and sampling.  Sphagnum peat thickness shall be defined as peat meeting the H-1 through H-6 criteria on the von Post scale.  Reed sedge peat thickness shall be defined as peat meeting the H-7 through H-10 criteria on the von Post scale.

11.  a)  Annual mitigation monitoring reports on the status of the restoration for each area reclaimed shall be submitted to this office for a minimum of 10 years after the commencement of restoration in that area. Reports shall be submitted by December 31 each year following the first growing season.  This office is responsible for evaluating these reports and monitoring the progress of the restoration/mitigation areas for each year.  The 10-year monitoring requirement is based on an area reaching restoration goals within that timeframe.  Subject to the limit defined by the capped fund, additional monitoring will be required if the mitigation is deemed unsuccessful within the 10-year monitoring period.  Subject to the limit defined by the capped fund, the permittee is responsible for correcting any deficiencies within the mitigation monitoring reports and/or within the restored/mitigated areas.  The reports shall, at a minimum, include the following information:

> i) All plant species, along with their percent cover, shall be identified using standard transects and plots.  At least one representative plot shall be in each reclaimed area.  In addition, the presence and potential method for removal of any non-native/exotic species shall be documented in the report.

> ii) Photographs showing all representative areas of the reclamation site taken at least once during each growing season during the period July 1 to September 30.  Photos must be taken from the same reference point and direction of view each reporting year.

> iii) Groundwater elevations in the restored areas recorded once each month during April through September (frost-free period) of each reported growing season. The location of each monitoring site shall be shown on a plan view of the site.

b) Subject to the limit defined by the capped fund, the restoration on the site shall have the following goals:

> i) Hydrology:  Within five (5) years of initiating restoration, each restored area should meet the hydrology criterion for a wetland as defined in the 1987 Corps of Engineers Wetland Delineation Manual.  The restored areas should have soils saturated within 12 inches from the surface; however, open water non-vegetated areas (*e.g.*, ponds, pools, pits, *etc.*) are not authorized in this permit.  This hydrological requirement does not apply to depleted cells 1A, 2A, 3A, 19A1, 19A2, and 21A.

> ii) Vegetation: Within 5 years of initiating restoration, each restored area should be 100% covered with vegetation.  At least 75% of this vegetative cover must contain live, self-sustaining vegetation typical of bog and fen species including, but not limited to: *Sphagnum* and other mosses, ericaceous shrubs, and sedges.  In addition, no greater than 5% of the vegetated cover in the restored areas may consist of invasive/exotic plant species.  Specific

examples of unacceptable invasive/exotic plant species include *Phragmites australis, Lythrum salicaria,* and cattails *(Typha spp.).* This 100% vegetative requirement does not apply to depleted cells 1A, 2A, 3A, 19A1, 19A2, and 21A.

12. Ditch plugs must be installed at the times and locations noted in the project description.

13. All storage pads, equipment, facilities, trash, and debris must be removed from the plant site building demolition area. Peat may be used to augment soil conditions at the site; however, all other excess stockpiled materials must be removed from the area.

14. This permit will not become effective until any ongoing federal Clean Water Act enforcement litigation that applies to the acreage subject to this permit is resolved.

Further Information:

1. Congressional Authorities: You have been so authorized to undertake the activity described above pursuant to:

() Section 10 of the Rivers and Harbors Act of 1899 (33 U.S.C. 403).

(X) Section 404 of the Clean Water Act (33 U.S.C. 1344).

() Section 103 of the Marine Protection, Research and Sanctuaries Act of 1972 (33 U.S.C. 1413).

2. Limits of this authorization.

a. This permit does not obviate the need to obtain Federal, state, or local authorizations required by law.

b. This permit does not grant any property rights or exclusive privileges.

c. This permit does not authorize any injury to the property or rights of others.

d. This permit does not authorize interference with any existing or proposed Federal project.

3. Limits of Federal Liability. In issuing this permit, the Federal Government does not assume any liability for the following:

a. Damages to the permitted project or uses thereof as a result of other permitted or unpermitted activities or from natural causes.

b. Damages to the permitted project or uses thereof as a result of current or future activities undertaken by or on behalf of the United States in the public interest.

c. Damages to persons, property, or to other permitted or unpermitted activities or structures caused by the activity authorized by this permit.

d. Design or construction deficiencies associated with the permitted work.

e. Damage claims associated with any future modifications, suspension, or revocation of this permit.

4. Reliance on Applicant's Data: The determination of this office that issuance of this permit is not contrary to the public interest was made in reliance of the information you provided.

5. Reevaluation of Permit Decision. This office may reevaluate its decision on this permit at any time the circumstances warrant. Circumstances that could require a reevaluation include, but are not limited to, the following:

a. You fail to comply with the terms and conditions of this permit.

b. The information provided by you in support of your permit application proves to have been false, incomplete, or inaccurate (See 4 above).

c. Significant new information surfaces which this office did not consider in reaching the original public interest decision.

Such a reevaluation may result in a determination that it is appropriate to use the suspension, modification, and revocation procedures contained in 33 CFR 325.7 or enforcement procedures such as those contained in 33 CFR 326.4 and 326.5. The referenced enforcement procedures provide for the issuance of an administrative order requiring you to comply with the terms and conditions of your permit and for the initiation of legal action where appropriate. You will be required to pay for any corrective measures ordered by this office, and if you fail to comply with such directive, this office may in certain situations (such as those specified in 33 CFR 209.170) accomplish the corrective measures by contract or otherwise and bill you for the cost.

6. Extensions. General condition 1 establishes a time limit for the completion of the activity authorized by this permit. Unless there are circumstances requiring either a prompt completion of the authorized activity or a reevaluation of the public interest decision, the Corps will normally give favorable consideration to a request for an extension of this time limit.

Your signature below, as permittee, indicates that you accept and agree to comply with the terms and conditions of this permit.

(PERMITTEE)

J. DAVID NEWMAN

9/21/05
(DATE)

This permit becomes effective when the Federal official, designated to act for the Secretary of the Army, has signed below.

John Konik for:
(DISTRICT ENGINEER)
Donald P. Lauzon
Lieutenant Colonel. U.S. Army

8/15/06
(DATE)

When the structures or work authorized by this permit are still in existence at the time the property is transferred, the terms and conditions of this permit will continue to be binding on the new owner(s) of the property. To validate the transfer of this permit and the associated liabilities associated with compliance with its terms and conditions, have the transferee sign and date below.

(TRANSFEREE)
Michigan Peat, LLC
David Newman, President

1-19-2024
(DATE)



NUMBER: 92-276-002.3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 1 OF 26

MICHIGAN PEAT MINDEN NORTH

REGIONAL SITE LOCATION MAP: SANILAC COUNTY

NO SCALE
[BWA # 99-006]        1-27-05

NORTH.







MICHIGAN PEAT MINDEN NORTH & MINDEN SOUTH PARCELS

MICHIGAN PEAT PROPERTIES:   USGS TOPOGRAPHIC MAP

SCALE 1"=4000'

[BWA # 99-006]

1-27-05

NUMBER: 92-276-002-3/94-8-342
Mi PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River  Minden City
SANILAC County. MICHIGAN
SHEET  2 OF 26

NORTH






# MICHIGAN PEAT: MINDEN NORTH

## ACTIVITY CATEGORIES

SCALE 1"=2000'   6-20-05
[BWA # 99-006]

 DITCH
ROAD

NUMBER: 92-276-002-3/94-6-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 3 OF 26

### LEGEND: ACTIVITY CATEGORIES

▬ HISTORICALLY HARVESTED AREAS (951 AC)

▦ CONSERVATION EASEMENT/ DONATION AREA

▥ HARVEST TO 1' SPHAGNUM PEAT REMAINING

▦ HARVEST TO 4' REED-SEDGE PEAT REMAINING (WHERE GREATER THAN 4' OF REED-SEDGE PEAT CURRENTLY EXISTS)

▧ DEPLETED AREAS

▨ TRANSITION ZONE

NOTE: ALL AREAS INDICATED ARE APPROXIMATE ONLY



# MICHIGAN PEAT: MINDEN SOUTH

## CONSERVATION EASEMENT AREAS

SCALE 1"=2000'   6-20-05
[BWA # 99-006]





LEGEND: ACTIVITY CATEGORIES

CONSERVATION EASEMENT/ DONATION AREA

NOTE: ALL AREAS INDICATED ARE APPROXIMATE ONLY.

NUMBER: 9 2,276-002-3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 4 OF 26



LEGEND
- - EXISTING ROADS
— PROPOSED ROADS

NUMBER: 92-276-002-3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 5 OF 26

MICHIGAN PEAT MINDEN NORTH

EXISTING AND PROPOSED ROADS

SCALE 1"=2000'   6-20-05
[SWA # 99-006]

(ROAD WIDTH EXAGGERATED
FOR CLARITY - NOT TO SCALE)

NORTH





PEAT HARVEST AREA

ORGANIC MATERIAL FROM PROCESSING
AND LOGS/BRUSH FROM SITE CLEARING

CLAY FILL

HAUL ROAD
TOP WIDTH APPROX. 30 FT
(BOTTOM WIDTH APPROX. 45 FT)

APPROX. 18" - 24"

PEAT

NUMBER: 92-276-002-3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 6 OF 26

# MICHIGAN PEAT MINDEN NORTH

## PROPOSED HAUL ROAD: TYPICAL CROSS-SECTION

NOT TO SCALE 6-20-05
[BWA # 99-006]



## MICHIGAN PEAT: MINDEN NORTH

### BUFFERS AND TRANSITION STRIPS

SCALE 1"=2000'   6-24-05
[BWA # 99-006]

  N   — DITCH
— ROAD

### CROSS-SECTION LOCATIONS NOTED

LEGEND:  BUFFER & TRANSITION STRIPS

100' WIDE NO HARVEST BUFFER STRIP
(WIDTH EXAGGERATED FOR CLARITY - NOT TO SCALE)

1:10 SLOPE GRADIENT STRIP
(WIDTH EXAGGERATED FOR CLARITY - NOT TO SCALE)

NOTE: ALL AREAS INDICATED ARE APPROXIMATE ONLY.
SEE PERMIT NARRATIVE FOR SPECIFIC DETAILS OF THESE AREAS

NUMBER: 92-276-002-3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 7 OF 26

NUMBER: 9.2.276-002-3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 8 OF 26

REDUCED COPY

## soil and materials engineers, inc.

NUMBER: 92-276-002-3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 9 OF 26

soil and materials engineers, inc.

Project Title: MINDEN BOG NORTH

Sheet Title: CROSS SECTIONS A-A' AND B-B' INTERIM PEAT HARVEST



NUMBER: 92-276-002-3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 10 OF 26

soil and materials engineers, inc.

Project Title
MINDEN BOG NORTH

Sheet

Title
CROSS SECTIONS

Drawing Record

Revision Record





REDUCED COPY
7-1-05

NUMBER: 92-276-00 2.3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 11 OF 35

NUMBER: 92-276-002-3/94-8-342
MI PEAT_EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay, Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 13 OF 26



NUMBER: 92-276-002-3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 13 OF 25





6-24-05

# CROSS-SECTION D-D'

WEST (D)

NUMBER: 92-276-002-3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 14 OF 26

CROSS SECTION WEST D
AFTER PEAT HARVEST COMPLETED
MINDEN BOG NORTH
MINDEN, MICHIGAN

DATE: 6-23-05
SCALE: AS SHOWN
DRAFTER: JAB
JOB: LE26493

sme
BAY CITY GRAND RAPIDS KALAMAZOO
LANSING PLYMOUTH SHELBY TOLEDO

FILE NAME K:\26000\26493-D-CD-afterpeat.DWG

LEGEND

EXISTING DITCHES

NUMBER: 92-276-002-3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 15 OF 26

MICHIGAN PEAT MINDEN NORTH

EXISTING DITCHES

SCALE 1"=2000' 6-20-05

[BWA # 99-006]

(DITCH WIDTH EXAGGERATED
FOR CLARITY - NOT TO SCALE)

NORTH



## Michigan Peat Minden North
## Existing Ditch Dimensions
## 1-27-05
## (All dimensions approximate)

| Ditch ID | Dimensions L (Ft) |
|---|---|
| 1D1 | 2,800 |
| 1D2 | 2,800 |
| 2D1 | 2,720 |
| 2D2 | 2,960 |
| 3D1 | 2,720 |
| 3D2 | 5,120 |
| 4D1 | 8,000 |
| 5D1 | 8,000 |
| 6D1 | 8,000 |
| 7D1 | 8,000 |
| 8D1 | 7,920 |
| 9D1 | 7,920 |
| 12D1 | 7,920 |
| 19D1 | 2,240 |
| 19D2 | 2,240 |
| 22D1 | 320 |
| CD1 | 400 |
| E/WD1 (MD1) | 10,960 |
| E/WD2 (Total Length Existing) | 6,960 |
| E/WD3 | 5,360 |
| E/WD4 | 10,560 |
| BED1 | 2,400 |
| BED2 | 2,320 |
| Total Length Existing Ditches | 118,640 |

NUMBER: 92-276-002-3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 16 OF 26

1-27-05

NUMBER: 92 275 602-3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.5 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 17 OF 26



**LEGEND**

— PROPOSED NEW OR UPGRADED EXISTING DITCHES

E/WD2 IS AN EXISTING 3 X 3 DITCH TO BE UPGRADED TO 6 X 20
DIMENSIONS. ALL OTHERS ARE PROPOSED NEW DITCHES.

## MICHIGAN PEAT MINDEN NORTH

PROPOSED NEW & UPGRADED EXISTING DITCHES

SCALE 1"=2000'   6-20-05
[BWA # 99-006]

(DITCH WIDTH EXAGGERATED
FOR CLARITY - NOT TO SCALE)

NORTH



# Michigan Peat Minden North
## Proposed New/Upgraded Ditch Dimensions
## 1-27-05
## (All dimensions approximate)

| Ditch ID | | Dimensions D x W x L (Ft) | | | Dredge Volume | |
|---|---|---|---|---|---|---|
| | | D | W | L | Cubic Ft | Cubic Yds |
| 10D1 | | 3 | 3 | 4,720 | 28,320 | 1,049 |
| 10D2 | | 3 | 3 | 4,720 | 28,320 | 1,049 |
| 10D3 | | 3 | 3 | 4,720 | 28,320 | 1,049 |
| 10D4 | | 3 | 3 | 4,720 | 28,320 | 1,049 |
| 11D1 | | 3 | 3 | 4,720 | 28,320 | 1,049 |
| 11D2 | | 3 | 3 | 4,720 | 28,320 | 1,049 |
| 11D3 | | 3 | 3 | 4,720 | 28,320 | 1,049 |
| 11D4 | | 3 | 3 | 4,720 | 28,320 | 1,049 |
| 12D2 | | 3 | 3 | 4,720 | 28,320 | 1,049 |
| 12D3 | | 3 | 3 | 4,720 | 28,320 | 1,049 |
| 12D4 | | 3 | 3 | 4,720 | 28,320 | 1,049 |
| 12D5 | | 3 | 3 | 4,720 | 28,320 | 1,049 |
| E/WD2 | Proposed upgrade | 6 | 20 | 2,000 | 160,000 | 5,926 |
| | Less existing ditch profile | 3 | 3 | 2,000 | 12,000 | 444 |
| | Additional dredge required | | | | 148,000 | 5,481 |
| E/WD5 | | 6 | 20 | 4,800 | 384,000 | 14,222 |
| E/WD6 | | 6 | 20 | 4,800 | 384,000 | 14,222 |
| E/WD7 | | 15 | 45 | 10,000 | 4,500,000 | 166,667 |
| BED1 | | 6 | 20 | 2,400 | 192,000 | 7,111 |
| BED2 | | 6 | 20 | 2,320 | 185,600 | 6,874 |
| Total Length of Proposed New Ditches | | | | 80,960 | | |
| Total Dredge Required for Proposed New/Upgraded Ditches | | | | | 6,133,440 | 227,164 |

NUMBER: 92.276-002-3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 18 OF 26



EXIST. GRADE

3'D X 3'W DITCH
SCALE: HORIZ= 1"=6'
VERT= 1"=6'

— T.O.B. ELEVATION RANGE:
787'-790' EXISTING CONDITIONS
786'-790' 20 YEAR POINT
784'-790' FINAL HARVEST POINT

·· DITCH BOTTOM ELEVATION RANGE:
774'-787'

ALL DITCHES WILL BE CONSTRUCTED AS PROPOSED AS SOON AS FEASIBLE AFTER PERMIT IS ISSUED. AS SURFACE ELEVATION OF ADJACENT HARVEST FIELD DECREASES OVER LIFE OF PROJECT, THE TOP OF BANK OF DITCH WILL ALSO DECREASE, WHILE THE ELEVATION OF THE BOTTOM OF DITCH REMAINS THE SAME. THE INDICATED RANGE OF THE T.O.B. ELEVATIONS FOR EXISTING (CURRENT) CONDITIONS, 20 YEAR POINT, AND FINAL HARVEST POINT HAS BEEN ESTIMATED BASED ON SME TOPOGRAPHIC MAPS.

PROPOSED 3 x 3 DITCHES INCLUDE 10D1, 10D2, 10D3, 10D4, 11D1, 11D2, 11D3, 11D4, 12D2, 12D3, 12D4, & 12D5.

NUMBER: 92-276-002-3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 982.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 17 OF 26

# MICHIGAN PEAT MINDEN

TYPICAL CROSS-SECTION

PROPOSED 3'D X 3'W DITCH

SCALE: H & V 1"=6'  [BWA FILE #99-006]    6-20-05



ALL DITCHES WILL BE CONSTRUCTED AS PROPOSED AS SOON AS FEASIBLE AFTER PERMIT IS ISSUED.  AS SURFACE ELEVATION OF
ADJACENT HARVEST FIELD DECREASES OVER LIFE OF PROJECT, THE TOP OF BANK OF DITCH WILL ALSO DECREASE,
WHILE THE ELEVATION OF THE BOTTOM OF DITCH REMAINS THE SAME. THE INDICATED RANGE OF THE T.O.B. ELEVATIONS FOR EXISTING
(CURRENT) CONDITIONS, 20 YEAR POINT, AND FINAL HARVEST POINT HAS BEEN ESTIMATED BASED ON SME TOPOGRAPHIC MAPS.

PROPOSED 6 X 20 DITCHES INCLUDE E/WD5, E/WD6, BED1 & BED2.  E/WD2 IS AN EXISTING 3 X 3 DITCH TO BE UPGRADED TO  6 X 20 DIMENSIONS.

NUMBER: 92-276-002-3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.5 A EXPANSION
BY MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET __ OF 36

# MICHIGAN PEAT MINDEN NORTH

TYPICAL CROSS-SECTION

PROPOSED 6'D X 20'W DITCH

SCALE: H & V 1"=6'   [BWA FILE #99-006]    6-20-05





# PROPOSED E/W D7 DITCH

## CROSS SECTION LOCATIONS

NUMBER: 92-276-002-3
MI PEAT-EXISTING 951 A/PROPOSED 662.6 ACRE EXPANSION
BY: Michigan Peat Company/Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 17 OF 22

LEGEND

| | | | |
|---|---|---|---|
| | SPHAGNUM | — — - — | INITIAL DITCH ELEVATION |
| | REED-SEDGE | — — | INTERIM DITCH ELEVATION |
| | CLAY | — · - · — | FINAL DITCH ELEVATION |
| | | IV | NORTH TO SOUTH CROSS-SECTION LOCATION |

VERTICAL SCALE: 1" = 24'
HORIZONTAL SCALE: 1" = 1,200'

CURRENT CONDITIONS AND PROPOSED E/WD7 DITCH ELEVATIONS
(INITIAL, INTERMEDIATE AND FINAL)

CROSS-SECTION OF SOUTHERN DITCH
MINDEN NORTH PEAT BOG
MICHIGAN PEAT COMPANY
MINDEN CITY, MICHIGAN

DATE 2-2-05
DRAWN BY JAB
SCALE AS SHOWN
JOB LE25493

BAY CITY
GRAND RAPIDS
KALAMAZOO
LANSING
PLYMOUTH
SHELBY
TOLEDO

FILE NAME R:\26000\25493-X\ditchD7.dwg

NUMBER: 92-276-002-3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 21 OF 26

6-24-05

## CROSS-SECTION I

LEGEND

SPHAGNUM

REED–SEDGE PEAT

CLAY

VERTICAL SCALE: 1" = 8'
HORIZONTAL SCALE: 1" = 80'

NUMBER: 92-276-002-3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 22 OF 26

FINAL CONDITIONS: 25 to 30 YEARS AND PROPOSED E/WD7 DITCH ELEVATIONS

THE ELEVATIONS AT CROSS SECTION TAKEN WITHIN CELL 11C
ELEVATIONS AT FINAL TIME PERIOD ARE APPROXIMATE ESTIMATES.

| | | | |
|---|---|---|---|
| sme 2663 EATON RAPIDS ROAD LANSING, MICHIGAN 48911 (517) 887-9181 | BAY CITY<br>GRAND RAPIDS<br>KALAMAZOO<br>LANSING<br>PLYMOUTH<br>SHELBY<br>TOLEDO | DATE 6–23–05<br>DRAWN BY JAB<br>SCALE AS SHOWN<br>JOB LE26493 | SOUTHERN PART CROSS–SECTION I<br>MINDEN NORTH PEAT BOG<br>MICHIGAN PEAT COMPANY<br>MINDEN CITY, MICHIGAN |

FILE NAME R:\26000\26493–X1_ditch.dwg

Figure No. 1A



II

NORTH                                                    SOUTH

NUMBER: 92-276-002-3/94.8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 23 OF 26

LEGEND
SPHAGNUM
REED-SEDGE PEAT
CLAY

VERTICAL SCALE:   1" = 8'
HORIZONTAL SCALE:  1" = 80'

CURRENT CONDITIONS AND PROPOSED E/WD7 DITCH ELEVATIONS

(EXISTING, INTERMEDIATE—20 YEARS, AND FINAL—25 to 30 YEARS)

THE ELEVATIONS AT THE INTERMEDIATE AND FINAL TIME PERIODS ARE APPROXIMATE ESTIMATES



| | | |
|---|---|---|
| BAY CITY | DATE 2-15-05 | SOUTHERN PART CROSS-SECTION II |
| GRAND RAPIDS | | MINDEN NORTH PEAT BOG |
| KALAMAZOO | DRAWN BY JAB | |
| LANSING | SCALE | MICHIGAN PEAT COMPANY |
| PLYMOUTH | AS SHOWN | MINDEN CITY, MICHIGAN |
| SHELBY | JOB | |
| TOLEDO | LE26493 | |

2525 EATON RAPIDS ROAD
LANSING, MICHIGAN 48911
(517) 887-9181

FILE NAME R:\26000\26493-X2_ditch.dwg



6-24-05

CROSS-SECTION III

NUMBER: 92-276-002-3/94-8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 24 OF 26

NORTH                                      SOUTH

FINAL CONDITIONS: 25 TO 30 YEARS AND PROPOSED E/WD7 DITCH ELEVATIONS

THE ELEVATIONS AT THE FINAL TIME PERIOD ARE APPROXIMATE ESTIMATES
CROSS SECTION TAKEN WITHIN CELL 5C

LEGEND
REED—SEDGE PEAT
CLAY

VERTICAL SCALE:   1" = 8'
HORIZONTAL SCALE:  1" = 80'

| BAY CITY | DATE 6-23-05 | SOUTHERN PART CROSS—SECTION III |
| GRAND RAPIDS | DRAWN BY JAB | MINDEN NORTH PEAT BOG |
| KALAMAZOO LANSING PLYMOUTH | SCALE AS SHOWN | MICHIGAN PEAT COMPANY |
| SHELBY TOLEDO | JOB LE26493 | MINDEN CITY, MICHIGAN |

FILE NAME R:\26000\26493-X3_ditch.dwg

Figure No. 3A



IV

NORTH                                               SOUTH

NOTE: WHERE LESS THAN 4 FEET OF REED SEDGE
EXISTS, THE SPHAGNUM WILL BE REMOVED TO THE
TOP OF THE REED SEDGE.

NUMBER: 92-276-002-3/94 8-342
MI PEAT-EXISTING 951 A/PROPOSED 682.6 A EXPANSION
BY: MI Peat Co./Bay-Houston Towing
Black River, Minden City
SANILAC County, MICHIGAN
SHEET 25 OF 26

LEGEND

SPHAGNUM

REED–SEDGE PEAT

CLAY

VERTICAL SCALE:    1" = 8'
HORIZONTAL SCALE: 1" = 80'

CURRENT CONDITIONS AND PROPOSED E/WD7 DITCH ELEVATIONS
(EXISTING, INTERMEDIATE–20 YEARS, AND FINAL–25 to 30 YEARS)
THE ELEVATIONS AT THE INTERMEDIATE AND FINAL TIME PERIODS ARE APPROXIMATE ESTIMATES



BAY CITY
GRAND RAPIDS
KALAMAZOO
LANSING
PLYMOUTH
SHELBY
TOLEDO

DATE 2-15-05
DRAWN BY JAB
SCALE AS SHOWN
JOB LE26493

SOUTHERN PART CROSS–SECTION IV
MINDEN NORTH PEAT BOG
MICHIGAN PEAT COMPANY
MINDEN CITY, MICHIGAN

FILE NAME R:\25000\26493-X1_ditch.swg



CURRENT CONDITIONS AND PROPOSED E/WD7 DITCH ELEVATIONS

(EXISTING, INTERMEDIATE—20 YEARS, AND FINAL—25 to 30 YEARS)

THE ELEVATIONS AT THE INTERMEDIATE AND FINAL TIME PERIODS ARE APPROXIMATE ESTIMATES

SOUTHERN PART CROSS—SECTION V
MINDEN NORTH PEAT BOG
MICHIGAN PEAT COMPANY
MINDEN CITY, MICHIGAN